Commonwealth *v.* Edwards, Appellant.

Argued November 21, 1958.   Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and BOK, JJ.

reargument refused January 12, 1959.

*Garfield W. Levy,* with him *Donald J. Goldberg,* and *Levy & Oliensis,* for appellant.

*James McGirr Kelly,* Assistant District Attorney, with him *Juanita Kidd Stout,* Assistant District Attorney, *James N. Lafferty,* First Assistant District At-

torney, and *Victor H. Blanc*, District Attorney, for appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 5, 1959:

On June 22, 1957, in the city of Philadelphia, Curtis Raymond Edwards, being then 14 years and 11 months of age, shot and killed Martin Daniels, Sr. He was indicted for murder and found guilty of murder in the first degree with the penalty fixed at life imprisonment. He has appealed for a new trial, alleging trial errors. Only one needs to be considered.

The defense was insanity. The Trial Judge charged the jury: "Now, if you find that the defense of insanity, as I have outlined it to you, has been established by a fair preponderance of the evidence, then you should render a verdict of acquittal. However, if you do not believe the defense of insanity has been proved by a fair preponderance of the evidence by the defendant upon whom the burden rests, then you must fix the degree of crime by a verdict of guilty of either murder in the first degree with penalty of death, or murder in the first degree with penalty of life imprisonment; or murder in the second degree or voluntary manslaughter. You must weigh the evidence as you find the facts under the law as I have instructed you and arrive at one, and only one, of the five possible verdicts which I have now submitted to you."

Under this charge the Trial Judge ruled out the possibility of a simple verdict of Not Guilty. He told the jury that they could render a verdict of acquittal because of insanity but not for any other reason. He said that they could return "one, and only one" of the five possible verdicts he enumerated. These five possible verdicts were: 1. Not Guilty because of insanity. 2. First degree murder with death. 3. First degree

murder with life imprisonment. 4. Second degree murder. 5. Voluntary Manslaughter.

But suppose the jury did not believe that a crime had been committed or, if committed, that the defendant was not the one who had done the deed. The Commonwealth, emphasizing that the defendant killed Martin Daniels, Sr., and that the defendant admitted the killing, argues: "It seems ridiculous to require the Trial Court to continue to charge on the presumption of innocence once the defendant has admitted the circumstances surrounding the offense." History has demonstrated that there have been many so-called ridiculous cases in which innocent persons have been accused of crime and often unjustly convicted, even executed. It is not for the prosecuting officials to say whether the position of the defendant, insofar as the judge's charge is concerned, is ridiculous or not.

The Commonwealth says further: "While a presumption of innocence continues until there is a conviction, it would be unreasonable to expect a jury to acquit an admitted slayer who had absolutely no justification or excuse for committing the slaying."

But it must still be left to the jury to decide whether an admitted slayer had or did not have justification or excuse for what he did. While it may be true that in many cases where the slayer admits to the slaying, there can be little or no justification or excuse for the homicide, there have also been many deaths which the law has acknowledged as unavoidable or justified under the circumstances. Many automobile mishaps fall within the former category and self-defense killings come within the latter.

To say that a judge need not charge on an indispensable requirement in the law because the defendant is assuredly guilty is to hang the accused first and indict him afterwards. It is the trial and the trial alone

which decides whether a defendant is assuredly guilty. The presumption of innocence is not merely a papier-maché figure for dramatic display in the courtroom; it is a reality without which trials become mere play-acting with the verdict residing in the judge's pocket before the jury is sworn. Even, if in a hypothetical case, the evidence of guilt piles as high as Mt. Everest on Matterhorn, even if the District Attorney conscientiously believes the defendant to be as guilty as Cain, and no matter with what certainty the Judge views the culpability of the accused at the bar, the defendant is still entitled to all the safeguards of a fair trial as announced in the Constitution and the law of the land. An eminent English author, in a recently published book, said that "the rules governing the admissibility of evidence are something of a mystery to the man in the street, who is apt to think of them as lawyers' hocus-pocus. This view is unwarranted. Though they sometimes seem—and sometimes are—mechanical and arbitrary in operation, such rules are based on long and rich experience of what is required to protect the individual."[1]

In the same manner, there are certain rules concerning a judge's charge which simply cannot be ignored since they are based on long and rich experience of what is required to protect the individual accused of crime.

Our system of jurisprudence is based on precedent. To allow a glaring omission in a judge's charge to go uncorrected would mean that in future trials where the evidence to convict would not be so overwhelming as the District Attorney and the lower Court believe it to be in this case, a similar omission could not be

---

[1] Edgar Lustgarten, "The Murder and the Trial, 1958" Charles Scribner's Sons, 1958, p. 15.

complained of because this case would be cited as a precedent. It will be recalled that when Bassanio asked that the law be modeled to suit his pressing needs, Portia answered:

"It must not be; there is no power in Venice
Can alter a decree established:
'Twill be recorded for a precedent,
And many an error, by the same example,
Will rush into the state; it cannot be."[2]

Not to order a new trial in the case at hand would be to set our approval on an error and by that example, error could be cited as authority, and a misleading signboard would rise on the highway of truth.

The Commonwealth incredulously asks: "Is the Trial Court to be held to a slavish unthinking charge or should the Trial Judge expect a jury to act as reasoning men and women, when the facts are not in dispute?"

It is not for the Commonwealth or for the Trial Court to decide whether a basic and elementary feature of a charge should be omitted, on the basis of prophetic certainty that the jury will return a verdict of guilty because of facts which seemingly are not in dispute. The law of the Commonwealth places in the hands of the jury the exclusive responsibility of deciding guilt, and the Court may not restrict the jury's possible conclusions to a number which excludes the very important one of not guilty. Otherwise, the law would authorize a Trial Court to give binding instructions in favor of the Commonwealth which, of course, is not only "unthinking" but unthinkable. In *Commonwealth v. Flax*, 331 Pa. 145, 154-5, this Court said: "When a defendant in a murder indictment enters a plea of 'not guilty', the burden is put upon the Commonwealth to prove

---

[2] Merchant of Venice, Act IV, sc. 1.

him guilty beyond a reasonable doubt, either of murder in the first degree, or murder in the second degree, or voluntary manslaughter, or otherwise the Commonwealth must suffer an acquittal. The defendant is under no obligation to take the stand and deny or explain or attempt to excuse the homicide, but if he does, and he explains or attempts to excuse it on the theory of self-defense or of an accidental killing, and even though the theory thus advanced by him in his testimony is rejected by the jury, the burden still remains on the Commonwealth to prove the essential ingredients of at least one of the crimes charged in the indictment before it is entitled to a conviction."

The Commonwealth contends further that: "The proper test is whether or not the charge as a whole is accurate and fair and contains no basic or prejudicial error and a conviction should be sustained even if isolated excerpts taken from the charge might be objectionable."

But the fault in the Judge's charge here is not the matter of an isolated excerpt being objectionable, although even in that case a reversal would be imperative if the excerpt in question was capable of misleading the jury. Here we have, not an "isolated excerpt" but a definite and positive instruction at the end of a long charge which covered 66 legal size sheets in the typewritten transcript. Since the defense was that of insanity the Judge perforce had to devote attention to the subject of psychiatry as introduced by medical witnesses. Some of this testimony, as psychiatric evidence can without too much effort be, was abstruse and ambiguous. The jury looked to the Judge for clarification and direction.

The facts in the case are briefly as follows. As already noted, the defendant Edwards killed Martin Daniels, Sr. The son of the deceased Daniels, Martin

Daniels, Jr., a boy of some 14 years, had been a close friend and companion of the defendant Edwards for four or five years. From time to time the junior Daniels related to Edwards stories of how his father brutally beat him, how he struck him with his fists, kicked him, and otherwise manhandled him, how he also struck his mother, how he betrayed her, and so on. These stories had a marked effect on Edwards who, himself, knew something of paternal tyranny, his own father having used physical violence both on him and his mother over a period of time. Edwards' father was evidently a very bad man because the State, after appropriate preliminaries, duly electrocuted him.

Edwards reacted keenly to what he heard about the senior Daniels' cruelties and brutalities, some of which he witnessed himself because he was a frequent visitor at the Daniels home.

A day came along (Friday, June 21, 1957) when young Daniels calmly announced to Edwards that he intended to kill his father and asked Edwards if he would like to join in the venture. Edwards accepted the grim invitation. On the next day they obtained a 30 caliber rifle and, with a third young conspirator, Albert Strolis, they took up a position of vantage in a cemetery across the street from the senior Daniels' home. It was agreed that Edwards was a better shot than the junior Daniels and he was thus entrusted with the markmanship which would insure that the avenging bullet would strike only the senior Daniels and not also the mother or the younger brother Billy who might be with the father. At 9:30 that evening they began their vigil, crouching behind the wall which overlooked the street. At about 11 o'clock the senior Daniels appeared on the scene. He sat on the steps in front of his house. Albert Strolis inserted a cartridge into the rifle, and turned it over to Edwards

who took careful aim, resting the barrel of the weapon on the wall, pulled the trigger, and the senior Daniels toppled, the bullet hitting him in the chest.

It was argued in Edwards' behalf that he had so assimilated the stories of parental brutality, as related by the junior Daniels, that he identified himself as a brother of the Daniels boy and that, in killing the senior Daniels, he was in effect killing his own father. Dr. Aaron W. Mallin, called by the defendant, testified that Edwards was suffering from a type of insanity known as *foilé a deux*. The doctor explained: "In his insane mind he believed that he was killing his own brutal father, had no concept that this was wrong and could not have killed anyone else." He said further that the malady was an "induced or communicated type of insanity."

In describing Dr. Mallin's theory to the jury, the Trial Judge said: "Now, he said that prior to April 2nd, in cross-examination, he never saw this defendant before, and again said that *foile a deux* was the madness of two, or in two, or by two, in a form that was induced or communicated, and I do not know whether he used the word 'transmitted', we heard that here too; but whatever it was I think he said it was induced or communicated from the other person who has this type of illness. He said he never examined Martin Daniels, Jr., at all. And he said that a transfer of an illness from one to another is usually a delusion, but not necessarily a delusion, that the inducee absorbs or takes something from the original party who has this type of illness. He also said in answer to a question by Mr. Sprague that he never had a case of this sort in his whole practice. And I think he said, but again it is for you to remember, that where it does occur is usually associated with a paranoid or a manic depressive state. And I think he said that term, or

this situation, or this condition, whatever it is, illness,
of *foile a deux*—I am talking now about *foile a deux*—
is something that is recognized in psychiatry every-
where. And then there was some reference to what
Dr. Ornsteen said, and you heard that testimony here.
At any rate, it is for you to put your own evaluation
and determination upon that under the instructions
that I will give, and I have not reached that yet at all.
And that was that."

It can be doubted, without in any way reflecting
on the Trial Judge, that the jury were very much en-
lightened by this discussion.

With regard to the Commonwealth's psychiatrist,
Dr. Frederic H. Leavitt, the Judge charged: "Now, he
too, said he had never actually examined this Martin
Daniels, Jr., although he had seen him here; and with-
out going into so much detail I think there was some
philosophical discussion as to psychiatry being a ques-
tion of opinion, or whether it involved the general study
of behaviorism, and so forth. But you heard all that,
and whatever credence and whatever valuation, or
evaluation, you want to place on that, you, of course,
are the Jury and under the instructions that I give you,
if you find it material, one way or the other, why, you
will give it that evaluation."

It can also be doubted whether the jury got a very
clear picture of what the Commonwealth was here con-
tending with regard to the defendant's mental condi-
tion. In addition, there was brought into the case a
phenomenon called a *catathymic crisis,* which the Judge
briefly touched upon: "And there was some reference
to, as I remember, in Dr. Leavitt's examination, to I
think Dr. Ornsteen's testimony about the other boy.
But you heard all that, too. He said he would agree
with him in part and he would disagree in part; he
said something about a catathymic crisis, I think that

is the term. Now, that is my remembrance generally of that testimony; but, as I say, it is kind of testimony you heard so freshly, and certainly this latter part, and the rest of it is something, as I say, almost conceded, even though it is still for you to find, that I do not know that any further elaboration on my part is either necessary or warranted."

Although the terms *foile a deux* and *catathymic crisis* could not but be confusing to the jury, the Commonwealth contends that the jury had no difficulty in analyzing the testimony on the subject because the Court charged: "Therefore, on this issue of insanity, you must carefully weigh and consider all the evidence in the case and if, after such consideration, you conclude that the evidence which tends to support defendant's contention that he was insane at the time he caused the death of the deceased is more convincing and more persuasive when weighed against the presumption of his sanity and the evidence of the Commonwealth in support of it, then you must find the defendant not guilty because of insanity."

But, correct as this instruction is, it only accentuates the error of the final instruction when the Judge said that if the jury did not find the defendant not guilty because of insanity they had to find him guilty of murder or manslaughter.

It is true, as the Commonwealth says, that the Trial Judge did charge the jury that if the Commonwealth did not prove the defendant guilty beyond a reasonable doubt he had to be acquitted. In this respect, the Commonwealth calls our attention to the following statement of the Judge: "Now, in every criminal case the Commonwealth must produce evidence to prove the guilt of the defendant of the crime charged beyond a reasonable doubt, and there never can be a conviction unless the guilt can be so proved. No matter what you may be-

lieve the circumstances and the facts actually to have been, no fact can be considered as existing against the defendant unless it be proved to you beyond a reasonable doubt . . : and unless they (the Commonwealth's contentions) are so proved, the verdict must be not guilty."

This appears on the 6th page of the Court's charge. Then on the 64th page appears the Judge's peremptory direction complained of. In the meantime the jury had been taken through the fog and the bog of the psychiatric discussion. The jury could only regard with relief the final words of the Court which charged them in words of the utmost clarity as to what they were to do. What went before merged into this absolute directive. The Judge himself practically cancelled out what he had previously said about a possible verdict of not guilty. Soldiers who listen to their captain speaking for an hour will naturally be guided by what he says at the end when he sums up everything and tells them in 1-2-3-4 language what they are to do. If this contradicts what he said before, it is the 1-2-3-4 which counts.

It is, of course, regrettable that the inadvertence on the part of the Trial Judge should necessitate a retrial of the case. The record reveals that the case was tried well by experienced advocates and that the Trial Judge presided ably. However, his error, which, of course, was an oversight, was basic and fundamental. It is incapable of being cured. It was practically the signature to the charge. The two paragraphs which followed covered only the formal utterance that the verdict must be unanimous and that the jury should use common sense in arriving at a verdict. Thus, it was inevitable that the predominating instruction which the jury took away with them was the listing of the verdicts they could choose from—the five they could count on one hand, the five which excluded Not

Guilty. To dilate further on an error so absolute would be to belabor the obvious and embroider the elementary.

The verdict is reversed with a *venire facias de novo*.
Mr. Justice BENJAMIN R. JONES dissents.

------

DISSENTING OPINION BY MR. JUSTICE BELL:

The decision of the majority of the Court granting a new trial because of the alleged error in the charge of the trial Judge is to me incomprehensible. Defendant wilfully, deliberately and with cold-blooded premeditation laid in wait for nearly two hours to shoot and kill Daniels, who was sitting across the street on his own door steps. Defendant was found guilty of murder in the first degree and, probably because of his youth, the jury fixed the penalty at life imprisonment. He is obviously a lucky boy not to have been executed. The Commonwealth proved beyond the peradventure or possibility of a doubt that defendant had carefully planned and committed a wilful, deliberate and premeditated first degree murder. Defendant orally admitted to one detective the details of the murder which he had committed; he subsequently executed a written confession admitting in detail his commission of the murder, and he later took the witness stand and admitted under oath how he had planned to kill and how he had shot and killed Daniels, giving once again the details of this wanton murder.

The trial Judge correctly charged the jury, as the majority admit, that the Commonwealth must produce evidence to prove that defendant was guilty of murder beyond a reasonable doubt, and if it fails to do so, defendant must be acquitted. The Court in its charge said: "Now, in every criminal case the Commonwealth must produce evidence to prove the guilt of the defend-

ant of the crime charged beyond a reasonable doubt, and there never can be a conviction unless the guilt can be so proved. No matter what you may believe the circumstances and the facts actually to have been, no fact can be considered as existing against the defendant unless it be proved to you beyond a reasonable doubt. The Commonwealth must prove by evidence beyond a reasonable doubt each of the elements necessary to constitute the crime charged, and unless they are so proved the verdict must be not guilty, . . ."

I pause to ask—could any charge be fairer to defendant?

Later on, after discussing the evidence pertaining to insanity, the trial Judge charged as follows: "Now, if you find that the defense of insanity, as I have outlined it to you, has been established by a fair preponderance of the evidence, then you should render a verdict of acquittal. However, if you do not believe the defense of insanity has been proved by a fair preponderance of the evidence by the defendant upon whom the burden rests, then you must fix the degree of crime by a verdict of guilty of either murder in the first degree with penalty of death, or murder in the first degree with penalty of life imprisonment; or murder in the second degree or voluntary manslaughter. You must weigh the evidence as you find the facts under the law as I have instructed you and arrive at one, and only one, of the five possible verdicts which I have now submitted to you."

The majority declare this to be error for which they grant a new trial because if "the jury did not believe that a crime had been committed, or, if committed, that the defendant was not the one who had done the deed" the jury could have acquitted defendant. As a theoretical statement of the law, that is of course correct, but it is a practical inanity! This was a murder trial

in which the Commonwealth had proved beyond the possibility of a doubt, and the defendant had admitted orally and in writing and under oath at his trial, that after careful planning *he* shot and killed Daniels, and his only excuse and his only defense was insanity. To pile Pelion upon Ossa, defendant pleaded "Not guilty by virtue of insanity".

It is theoretically correct that the jury could have acquitted defendant if they believed that a crime had not been committed, or if they believed that defendant was innocent because someone else had killed Daniels, or because of an alibi, or because defendant killed Daniels in self-defense, or because Daniels committed suicide. Why not grant defendant a new trial because (1) the trial Judge did not charge the jury on alibi and self-defense and suicide, (and tell the jury they could acquit defendant for all or any one of these reasons), or (2) they could likewise acquit defendant if they believed that a crime had not been committed, or (3) if they believed defendant did not commit the crime! Even the majority opinion approves the statement of the trial Judge that "the jury should use common sense in arriving at a verdict." Why limit the adjuration to juries and lower Courts? In the name of common sense, what else should a Judge discuss except the testimony which was presented in this case and the pertinent principles of law applicable thereto? We repeat, "Defendant pleaded 'Not guilty by virtue of insanity.'"* The jury was not trying an automobile acci-

---

* Defendant's counsel made the following statements to the jury as shown by the record: "This defendant did not plead not guilty; he pleaded not guilty by virtue of insanity. He did not deny the act in this case. He took the stand and he said exactly what he did, . . . . I have never said this to a jury before. . . . I do not ask you to send [defendant] out that door. I ask you . . . to say that he was not sane on June 22, 1957. I ask you then to find him

dent at Broad and Chestnut Streets, or a will contest, or an insurance contract; they were trying a case where the defendant *admitted that he wilfully and deliberately killed Daniels, and his only excuse and his only defense was insanity!* Even the experienced counsel for defendant thought the charge was perfectly proper and did not take any exception to this part of the charge or request any amplification of the charge—he merely took a general exception, which every lawyer and every Judge knows is customary and reaches only fundamental basic error. The majority's decision, I am sorry to say, makes a mockery of the law and is a travesty of justice.**

Courts all over the land are striving to eliminate or get away from technicalities. However, even if we resort to technicalities, the majority's decision cannot be justified. The law is well settled that a charge must be considered as a whole, and will not be reversed for isolated excerpts :*** *Commonwealth v. Kloiber,* 378 Pa. 412, 418, 106 A. 2d 820; *Commonwealth v. Donough,* 377 Pa. 46, 53, 103 A. 2d 694; *Commonwealth v. Patskin,* 372 Pa. 402, 422, 93 A. 2d 704. When taken

---

not guilty by virtue of insanity at the time of the commission of the offense, . . . ."

** The majority opinion states (although I cannot understand what it has to do with this appeal) "In the meantime the jury had been taken through the fog and the bog of the psychiatric discussion." The fog and bog were not created by the trial Judge—they were created by the psychiatrist for the defense. From the record of murder cases which are appealed to this Court, one gets the impression that every murderer and every criminal, according to some psychiatrist, is insane. Confidence in psychiatry will not be enhanced if a psychiatrist can always be found who will testify that every murderer and every criminal is insane.

*** In my opinion, the isolated excerpt upon which the majority rely to grant a new trial, even if considered alone, was an accurate statement of the law which was applicable to the facts in this case.

as a whole this charge correctly, accurately and fairly states the law.

For each of the foregoing reasons I would affirm the judgment and sentence.