THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JACOBO REYES ACEVEDO, Defendant and Appellant.

No. CR-71-75.    Decided May 15, 1972.

704

*Rafael L. Ydrach Yordán* for appellant. *Gilberto Gierbolini, Solicitor General,* and *Héctor R. Orlandi Gómez, Assistant Solicitor General,* for The People.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

After having been accused of the offenses of murder in the first degree and of the violation of § 4 of the Weapons Law, appellant Reyes Acevedo was convicted by a unanimous jury of the offense of murder in the second degree (33 L.P.R.A. § 633), and by the trial judge of a violation of the Weapons Law (25 L.P.R.A. § 414). He was sentenced to serve from 10 to 20 years in the penitentiary for the commission of the felony and one year in jail for the misdemeanor.

As a result of the fact that a not guilty verdict was not included among the possible verdicts that the trial judge instructed to the jury that it could return, we conclude, relying on the grounds hereinafter stated, that the judgment must be reversed and a new trial ordered.

The facts of the case, summarized, are the following: Appellant and another individual surnamed Figueroa

Ramos, on June 5, 1965, at dawn, were in a bar at Villa Prades when one of the young ladies working there asked him to take her and a co-worker to her home in Santurce. Against their will, they took them through Cupey to "El Lago" Hotel at ward San Antonio, Caguas. The girls entered a warehouse to call a taxicab. The hotel's owner, Carlos Quiñones Estrada, told them that they could not remain in the warehouse. When one of them got out, she heard Figueroa Ramos discussing with Quiñones. She heard a clash. She saw appellant coming out of some bushes. He grabbed her by an arm and told Figueroa: "Come, let us go." They left without the other girl. She saw that appellant was carrying a pocketknife with a curved blade, about six inches long "of those that close, with a wooden handle." His left hand was stained with blood. On the way she heard appellant when he said: "I think that I killed him." They stopped at a business in Hato Rey where appellant drank a beer and Figueroa Ramos drank a shot of rum. She then took a taxi and went to Bolívar Hotel.

Roberto Rivera, an employee of the "El Lago" Hotel, testified that during the heated argument between Figueroa and Quiñones, the latter, upon gesticulating with his arms, accidentally spilled "a beer" which Figueroa had in his hand. After excusing himself because of that, Quiñones went for "another beer" and while handing it to him, appellant "jumped . . . took out a knife from his pant's back pocket," held the victim by the hair and "knifed him in the throat and continued knifing him throughout the body and then they went stumbling down a precipice that there is in front of the canteen"; that immediately Figueroa Ramos told defendant: "Quickly, get in the car and let us go." Quiñones carried a revolver on his waist. He had a license to bear it.

Rafael Santiago Solá, the hotel's barman, testified that appellant and Figueroa arrived at the hotel with the two young ladies in a commercial bus around four in the morning. Appellant asked for four beers and said that he wanted to

rent two cabins. One of the girls got into the bar protesting that she was not a prostitute and that she was not going to the cabin. At that instant Quiñones arrived and asked what was happening and said that "they could not be there because they were at the entrance to the bar." The witness served the four beers. Quiñones remained talking to Figueroa. Later he came to the bar for another beer for Figueroa. Afterwards Roberto Rivera came and between the two of them they picked up Quiñones' body and took him to a cabin.

According to the pathologist, Quiñones' body had nine wounds, a six-inch one on the throat. Another one penetrated deeply and approached the heart at the level of the left ventricle of the fourth cavity, causing a severe hemorrhage that caused his death.

The assignments of appellant in support of his appeal are the following:

1.—That the trial court erred in not giving, and on the contrary, denying, instructions as to the offense of voluntary manslaughter.

Appellant argues that there was a heated and loud discussion between appellant and Quiñones who was the one to start the argument; that there was struggling between them; that they had become excited on account of the drinks.

■ As the Solicitor General correctly says: ". . . for the provocation to reduce the crime of murder to voluntary manslaughter, it must be of such a nature as to cause an ordinary man to lose control of himself and, impelled by such provocation, to act on the spur of the moment, without due reflection and without deliberate intent. *People* v. *Saltari*, 53 P.R.R. 850, 866 (1938)."

■ The evidence establishes that the argument in question was between Quiñones and Figueroa Ramos. Appellant did not participate in it, although he was close to both of them. The argument could not have been so offensive when on

spilling "the beer" from Figueroa's hand while gesticulating during the heat of the discussion, Quiñones excused himself and went to the bar and brought him another beer. There was no provocation on Quiñones' part toward the appellant to compel the latter to act on the spur of the moment without due reflection and without a deliberate intent.

It was not proper, therefore, to instruct the jury about the offense of voluntary manslaughter. *People* v. *Prados García*, 99 P.R.R. 373, 384 (1970).

2.—That the trial court erred in the approach and treatment given to the defense of insanity.

3.—That the jury's verdict is erroneous inasmuch as it denies to defendant the benefit of reasonable doubt and disregards vigorous technical evidence for the defense which at the same time is that of the court itself.

We will discuss these assignments jointly because they are closely related between themselves.

Appellant's psychiatric examination having been ordered at his request, for the purpose of deciding whether he could distinguish between right and wrong on the date of the commission of the offenses charged against him, he was examined by a panel of four psychiatrists on several occasions, the first time, more than four months after the events which gave rise to the informations in this case. In its report of November 15, 1966, the panel concluded that at the time of the commission of the offenses "it was most probable" that appellant "could not distinguish between right and wrong," because when he was examined he was suffering from schizophrenic reaction, paranoid type, of chronic development in remission of symptoms, for which reason it concluded that he could stand trial. On December 5, 1966, the trial court ordered that a copy of this report be sent to the defense and to the prosecuting attorney.

■■ At the request of the prosecuting attorney appellant was submitted to another psychiatric examination by Dr.

Ramón Señeriz. The defense was denied the names of the witnesses for the prosecution which the prosecuting attorney contemplated to use to prove appellant's mental soundness. There is nothing in the law imposing that obligation upon the prosecuting attorney. Neither did it lie to read to the jury the report of the psychiatrist panel inasmuch as it had not been admitted in evidence. The experts signing the report were available to the defense and in fact they testified at the latter's request.

■ It is argued that the purpose in having the said report read was to transfer to the prosecuting attorney the burden of the proof as to appellant's mental condition and that in refusing that it be read to the jury the burden of proof was laid on appellant. On the contrary, the Solicitor General correctly informs that:

". . . All persons are capable of committing crimes. (Section 39 of the Penal Code, 33 L.P.R.A. § 85) . . . it is presumed that defendant was in his sound mind when he committed the offense charged against him. By virtue of that presumption, the prosecuting attorney is not required to offer any evidence to show that defendant was sane at that moment, *unless evidence is offered and received which may create a reasonable doubt as to sanity*. It is incumbent upon the defendant to introduce said evidence if his defense relies on mental insanity. It is then, *not before*, that the prosecuting attorney is required to prove mental sanity as well as any other fact. *People* v. *Alsina*, 79 P.R.R. 44, 57–58 (1956); *People* v. *Rivera Raquel*, 95 P.R.R. 553 (1967); *Molina Santana* v. *Delgado, Warden*, 96 P.R.R. 185 (1968); *People* v. *Superior Court*, [92 P.R.R. 112 (1965)]. The record shows that the proceeding followed in the trial court conformed to the requirements of this ruling." (Italics in the original.)

Appellant further argues, in support of this assignment, that the trial court erred in not permitting the psychiatrists for the defense to refer to the contents of the medical reports, clinics, and patient's history; that said determination de-

prived appellant "of carrying more forcefully to the members of the jury the legitimacy of his insanity that dated back for years as corroborated by records of various institutions among others the Walter Reed Hospital of Washington." We do not agree.

██ Under the provision of § 19 of the Law of Evidence (32 L.P.R.A. § 1662), to the effect that a witness can only testify about facts personally and directly known to him, the expert is permitted to give his opinion, grounded on his specialized knowledge on the subject in issue and that is pertinent to same. His opinion must be grounded on his personal knowledge and observations or on testimonies given by others before the court and on documentary evidence, heard, or read by him, and not on knowledge acquired through reports rendered by others out of court inasmuch as in this case the opinion would be based on hearsay evidence.

██ It is an established doctrine that when there is conflict as to the state of mind of a defendant, the medical expert cannot base his opinion on reports and conclusions of other persons unknown to the jury and not supported by the evidence, or on other physicians' reports, or hospital records, or inquests of hospital employees, or prosecuting attorney's records, or on published press releases of the trial, which have not been admitted in evidence. *City of Laurel* v. *Upton*, 175 So.2d 621, 625 (Miss. 1965); *Gillespie Land and Irrigation Co.* v. *González*, 379 P.2d 135, 141 (Ariz. 1963); *Baumhoer* v. *McLaughlin*, 205 S.W.2d 274, 280 (Mo. App. 1947); *State* v. *Gevrez*, 148 P.2d 829, 831–832 (Ariz. 1944).[1]

The evidence as to appellant's state of mind was conflicting. The psychiatrists for the defense testified that on the date of the commission of the offense it was most probable that appellant could not distinguish between right and wrong.

---

[1] See, also, *State* v. *Layton*, 14 A.2d 771, 773 (N.J. 1940)—*affirmed*, 21 A.2d 732; *People* v. *Keough*, 11 N.E.2d 570, 572 (N.Y. 1937); *Ingles* v. *People*, 6 P.2d 455, 458–459 (Colo. 1931).

These experts upon examining appellant more than four months after the events concluded that at the time he could not stand trial. It was not until after September 13, 1966, when by virtue of an order of the court entered on this date that a panel of psychiatrists rendered its report (dated November 15, 1966) to the effect that on the date of the events it was most probable that appellant was unable to distinguish between right and wrong.

On the part of the prosecuting attorney, Dr. Señeriz testified that in order to be able to determine a person's sanity at a certain date, it was necessary to examine him immediately prior or subsequent to the said date for which reason he could not pass judgment on this question inasmuch as he examined him later. See *Molina Santana* v. *Delgado, Warden*, 96 P.R.R. 185, 193 (1968). But Dr. Juan Luis Mella, who examined appellant upon admitting him to the Hato Rey Psychiatric Hospital (former Clínica Juliá) three days after the events, was of the opinion that, although appellant was suffering from a severe undifferentiated chronic schizophrenic reaction, he could distinguish between right and wrong on the date of the events. Despite the lengthy and intense cross-examination to which he was subjected, he reaffirmed said opinion.

■ Evidently, the jury, upon settling the conflict in this expert evidence gave more probative weight to Dr. Mella's testimony whose evaluation of appellant's soundness was the one closer to the date of the commission of the offense. Such weighing is not erroneous in the absence of a showing that upon doing it prejudice, passion or partiality were involved. *People* v. *Pantoja Aguayo*, 97 P.R.R. 230, 233, 234 (1969); *People* v. *Rivera Raquel*, 95 P.R.R. 553, 559 (1967); *People* v. *Sánchez*, 79 P.R.R. 110 (1956).

■ 4.—That the trial court erred in informing the jury at the end of its instructions that "As a result of the evidence introduced during the course of this trial, you may reach one

of three possible verdicts, to wit: (1) Not guilty by reason of insanity; (2) Guilty of murder in the first degree; or (3) Guilty of murder in the second degree"; that erroneously as last instruction to the jury, it informed them that "Summarizing, you have three possibilities of verdict" telling them that these three possible verdicts were, guilty of murder in the first degree, guilty of murder in the second degree, or, not guilty by reason of insanity; that it should have instructed the jury that it could "declare" appellant not guilty of the offense charged against him independently of his defense of insanity. The instruction in question was not timely challenged, nor an additional instruction to the effect that another possible verdict was the general one of not guilty, was not requested then despite the court having asked the defense if it had any other exception to the instructions in addition to the three which appellant had suggested (among which the latter, which refers to the three possible verdicts, was not included) and which were considered by the court which informed that they were being refused for different reasons.

In view of the fact that the aforementioned instruction was not timely objected to as required by Rule No. 137 of the Rules of Criminal Procedure, we must decide, nevertheless, whether in charging the instruction in question a fundamental error was committed. See, *People* v. *Serrano Nieves,* 93 P.R.R. 55 (1966).

The events occurred on June 5, 1965. During the arraignment appellant's counsel requested 15 days to plead and requested that appellant be submitted to a psychiatric examination to determine "Whether on the date on which it is alleged that he committed the acts charged against him in the information he could distinguish between right and wrong."

After submitting appellant to a psychiatric examination, the panel of psychiatrists informed on October 28, 1965, that he was unable to stand trial. He was hospitalized at the psychiatric hospital in Río Piedras. On June 16, 1966, the

panel found him mentally capable of standing trial. On July 13, 1966, he was set free on bail. On November 15, 1966, the panel rendered a report that on the date of the events of the offense appellant could not distinguish between right and wrong. The case having been set for trial on March 13, 1967, appellant notified the trial court and the prosecuting attorney that he "intends to establish at trial—among others —the defense of mental derangement at the time of the alleged commission of the offenses charged against him."

During the trial and once the jury had been impanelled and the information read to questions of the trial judge, the defense pleaded not guilty. At the close of the evidence for the prosecution appellant's counsel declared that "according to the defense's theory, if defendant, Jacobo Reyes Acevedo, committed something of some nature, no matter what it was, on the occasion alleged in the information by the prosecuting attorney, he did it while being mentally unsound, without being able to distinguish between right and wrong. Not knowing what he was doing, not being sane, without being responsible for his acts, and being crazy."

Prior to the instruction about the three mentioned verdicts which was challenged, the trial court charged the jury that:

"JUDGE:

.    .    .    .    .    .    .    .

From the foregoing it is clear that in every murder, whether of the first or second degree, it must be proved, beyond reasonable doubt, that

(1) a human being was unlawfully murdered.

(2) that said act was committed with malice aforethought.

.    .    .    .    .    .    .    .

No person may be convicted of murder unless the death of the person allegedly killed, and the cause of the death, are proved as independent acts, the fact of the murder in itself, through direct evidence, the cause of the death, through evidence which does not leave reasonable doubt.

It is the first duty of a Jury to determine carefully, after hearing the witnesses' testimonies, whether the inculpatory circumstances from which the guilt may be inferred, are proved beyond reasonable doubt . . . . The question is whether the evidence, whether circumstantial or direct, establishes defendant's guilt beyond reasonable doubt. Defendant's guilt must be proved beyond any reasonable doubt. And when that reasonable doubt exists, defendant must be acquitted. Reasonable doubt is not merely a possible doubt. There exists reasonable doubt when after a careful examination, analysis, and comparison of all the evidence, the Jury's mind remains in such a state that they cannot decide if they have a firm conviction or real certainty with respect to the veracity of the facts involved in the information. . . . In criminal cases the law presumes that defendant is innocent until he is proved otherwise in a satisfactory manner and through competent evidence. This presumption of innocence accompanies defendant through the trial and the Jury must keep it also in mind upon deliberating . . . the Prosecuting Attorney is under the obligation to establish his guilt beyond a reasonable doubt. . . ."

In *Commonwealth* v. *Edwards*, 147 A.2d 313 (Pa. 1959), to the information of murder the defense of insanity was adduced. Defendant was convicted of murder in the first degree. The jury was instructed that if the defense of insanity was found established it should return a verdict of not guilty, that if it believed that that defense had not been established by a fair preponderance of the evidence, then the jury must fix the degree of the offense by a verdict of guilty of murder in the first degree, or in the second degree, or of voluntary manslaughter. He instructed them that they could return "one and only one" of the five verdicts which he had enumerated, one of which was the one of not guilty because of insanity. He did not include the simple verdict of not guilty. Defendant admitted on three different occasions, that he had killed the victim: first, to a detective to whom he narrated the details of the crime, then, in a written confession, and later,

from the witness stand when he testified that he planned to kill the victim and how he did it in all its details.

Nevertheless, a majority of the Supreme Court of Pennsylvania concluded that to omit an instruction about a not-guilty verdict constituted a fundamental error that required the reversal of the judgment and a new trial.

In answer to the argument that it is ridiculous to require an instruction on presumption of innocence when defendant has admitted the circumstances of the crime, the court, in *Edwards, supra,* on p. 314 said that:

"History has demonstrated that there have been many so-called ridiculous cases in which innocent persons have been accused of crime and often unjustly convicted."

It added that:

"But it must still be left to the jury to decide whether an admitted slayer had or did not have justification or excuse for what he did.

". . . The presumption of innocence is not merely a papier-maché figure for dramatic display in the courtroom; it is a reality without which trials become mere playacting with the verdict residing in the judge's pocket before the jury is sworn.

". . . To allow a glaring omission in a judge's charge to go uncorrected would mean that in future trials where the evidence to convict would not be so overwhelming as the District Attorney and the lower Court believe it to be in this case, a similar omission could not be complained of because this case would be cited as a precedent.

". . . The law of the Commonwealth places in the hands of the jury the exclusive responsibility of deciding guilt, and the Court may not restrict the jury's possible conclusions to a number which excludes the very important one of not guilty. Otherwise, the law would authorize a Trial Court to give binding instructions in favor of the Commonwealth which, of course, is not only 'unthinking' but 'unthinkable.' "

Even though in *Edwards, supra* at page 6 of its lengthy instructions, the court gave one to the effect that the Commonwealth must establish the guilt beyond a reasonable doubt

and that there can never be a conviction unless the guilt is established to that extent and that if not thus established, the verdict must be not-guilty, at page 64, the instruction appears challenged. Besides, the court enumerated to the jury the five possible verdicts among which the not guilty verdict does not appear. Hence, the court said at page 318 that "The jury could only regard with relief the final words of the court which charged them in words of the utmost clarity, as to what they were to do. What went before merged into this absolute directive. The judge himself practically cancelled out what he had previously said about a possible verdict of not guilty."

The dissenting opinion in *Edwards, supra,* is based on the fact that the instructions should be considered jointly and that a conviction should not be reversed on the basis of isolated excerpts of the instructions; that defendant had admitted that he had killed the victim deliberately and voluntarily and that his only excuse and defense was insanity.

In *Braley v. Gladden,* 403 F.2d 858 (9th Cir. 1968), upon reversing the order of the federal district court which denied the habeas corpus petition, the United States Court of Appeals for the Ninth Circuit ordered a holding of the petition without action for the purpose of giving an opportunity to the State for granting a new trial.

Braley having been accused in this case of murder in the first degree, at the trial in the state court he did not deny the murder. In his defense he insisted that at the time of the events he was completely drunk and, in the alternative, that he was legally insane. The trial judge did not charge the jury that ten of them could return a not guilty verdict. He instructed them as to the weight of the evidence for the prosecution, the presumption of innocence, and as to the verdicts of guilty of the different possible degrees of the crime.

The Federal Court of Appeals, referring to *Edwards, supra,* with approval, said:

"All recognize that a trial judge's influence upon the jury is profound . . . . Hence, the oversight in not furnishing the not guilty verdict form along with the opposite form constituted, in effect, a severely adverse comment by the trial judge, an impermissibly grave insinuation of judicial attitude toward the ultimate issue of guilt or innocence. Accordingly, we hold that the influence exerted by the trial judge, although unintended and probably resulting from a clerk's oversight, was so significantly irregular as to require a new trial." See, *People* v. *Way*, 177 N.W.2d 729 (Mich. 1970).

The significance of the case at bar is that, despite the correct instructions, the last instruction given to the jury by way of a *Summary* of all that had been previously informed is that they could only return one of three verdicts among which that of not guilty by reason of insanity was included and the simple verdict of not guilty was not included. This last instruction in effect invalidated the previous ones which were inconsistent with this one. It constituted a directive to the jury that if it could not be concluded that at the time on which the acts of the offense were committed, appellant could not distinguish between right and wrong, necessarily it must return a verdict of guilty in one of the degrees of the offense of murder. This instruction had the effect of denying the jury the power it has, and which cannot be curtailed, limited, or denied in any manner whatsoever, of weighing all the evidence and not giving credit to the evidence for the prosecution, and by virtue thereof, to return a not guilty verdict. We conclude, therefore, that the aforementioned last instruction to the jury prejudiced appellant's fundamental rights.

In view of what we have just set forth, the judgment rendered in this case by the Superior Court, Caguas Part, on June 9, 1967, will be reversed and the case remanded to the said court for the holding of a new trial.

Mr. Chief Justice Negrón Fernández took no part in the decision of this case. Mr. Justice Dávila concurs in the result.