EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.*
JACOBO REYES ACEVEDO, acusado y apelante.

*Número:* CR-71-75          *Resuelto:* 15 de mayo de 1972

*Rafael L. Ydrach Yordán,* abogado del apelante; *Gilberto Gierbo-lini, Procurador General,* y *Héctor R. Orlandi Gómez, Procu-rador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

Acusado de los delitos de asesinato en primer grado y de la infracción al Art. 4 de la Ley de Armas, el apelante Reyes Acevedo fue convicto por unanimidad del jurado del delito de asesinato en segundo grado (33 L.P.R.A. sec. 633), y por el juez sentenciador de la infracción a la Ley de Armas (25 L.P.R.A. sec. 414). Fue sentenciado a cumplir de 10 a 20 años de presidio por la comisión del delito grave y un año de cárcel por el delito menos grave.

Debido a que el veredicto de no culpable fue omitido de entre los posibles veredictos que el juez de instancia instruyó al jurado que podía rendir, concluimos, por los fundamentos relacionados más adelante, que debe revocarse la sentencia y ordenarse un nuevo juicio.

Los hechos del caso, sintetizados, son los siguientes:

El apelante y otro individuo apellidado Figueroa Ramos estaban en la madrugada del 5 de junio de 1965 en un bar en Villa Prades cuando una de las jóvenes que trabajaba allí le pidió que la llevara a ella y a una compañera a su hogar, en Santurce. En contra de la voluntad de ellas, las llevaron por Cupey al Hotel "El Lago", en el barrio San Antonio, de Caguas. Entraron ellas a un almacén allí a pedir un taxi. El dueño del hotel, Carlos Quiñones Estrada, les dijo que no podían permanecer en el almacén. Al salir una de ellas oyó a Figueroa Ramos discutir con Quiñones. Sintió un golpe. Vio

al apelante salir de unas matas. La agarró por un brazo y le dijo a Figueroa "vente vamos." Dejaron a la otra. Vio que el apelante portaba una cuchilla de hoja curva, como de seis pulgadas de largo "de esas que se cierran con el cabo de madera." Tenía la mano izquierda ensangrentada. En el camino oyó al apelante decir "yo creo que lo maté." Se detuvieron en un negocio en Hato Rey donde el apelante tomó una cerveza y Figueroa Ramos un palo de ron. Ella tomó entonces un taxi y fue al Hotel Bolívar.

Roberto Rivera, empleado del Hotel "El Lago" testificó que durante la acalorada discusión entre Figueroa y Quiñones, éste, al gesticular con los brazos, accidentalmente le tumbó a Figueroa "una cerveza" que tenía en la mano. Luego de disculparse por ese hecho, Quiñones le buscó "otra cerveza" y mientras se la entregaba, el apelante "saltó, . . . sacó una cuchilla del bolsillo trasero del pantalón", agarró a la víctima por el pelo y "le mandó un cuchillaso [sic] al cuello y entonces siguió mandándole cuchillasos [sic] al cuerpo y se fueron rodando por un precipicio que hay frente a la cantina."; que seguidamente Figueroa Ramos le dijo al acusado "móntate rápido y nos vamos." Quiñones tenía un revólver colocado en la cintura. Tenía licencia para portarlo.

Rafael Santiago Solá, el cantinero del hotel, testificó que el apelante y Figueroa llegaron al hotel con las dos jóvenes en una guagua comercial a eso de las cuatro de la mañana. El apelante pidió cuatro cervezas e indicó que deseaba alquilar dos cabañas. Una de las jóvenes se metió en la cantina protestando que no era mujer de la vida y que no iba a la cabaña. En esos momento llegó Quiñones, preguntó qué ocurría, y manifestó que "ellos no podían estar ahí porque ellos estaban en la misma entrada de la cantina." El testigo sirvió las cuatro cervezas. Quiñones se quedó hablando con Figueroa. Luego vino a la cantina por otra cerveza para Figueroa. Des-

pués vino Roberto Rivera y entre ellos dos recogieron el cuerpo de Quiñones y lo llevaron a una de las cabañas.

Según el patólogo, el cuerpo de Quiñones presentaba nueve heridas, una en el cuello de seis pulgadas. Otra penetró profundamente y abordó el corazón a nivel del ventrículo izquierdo de la cuarta cavidad, produciéndole una gran hemorragia que le causó la muerte.

Los apuntamientos del apelante en apoyo de su apelación son los siguientes:

1.—Que el tribunal de instancia incidió al no dar y por el contrario, denegar, instrucciones sobre el delito de homicidio voluntario.

Arguye el apelante que hubo una discusión en términos acalorados y tono alto entre el apelante y Quiñones quien inició la discusión; que hubo forcejeo entre ellos; que los ánimos estaban exaltados debido a la bebida.

■ Como indica correctamente el Procurador ". . . para que la provocación reduzca el delito de asesinato a homicidio voluntario tiene que ser aquella de naturaleza tal que haga perder el dominio de sí mismo a un hombre de temperamento corriente obligándolo a actuar por el impulso producido por notable provocación, sin la debida reflexión y sin formar un determinado propósito. *Pueblo* v. *Saltari*, 53 D.P.R. 893, 909–910 (1938)."

■ La prueba demuestra que la discusión en cuestión se desarrollaba entre Quiñones y Figueroa Ramos. El apelante no participa en la misma aunque permanecía cerca de ambos. No pudo ser la discusión tan enojosa cuando al tumbarle "la cerveza" de la mano a Figueroa al gesticular en el calor de la discusión, Quiñones se disculpó y fue a la cantina y le trajo otra. No hubo provocación alguna de parte de Quiñones hacia el apelante que obligara a éste a actuar por impulso sin la debida reflexión y sin formar un determinado propósito.

No procedía, por lo tanto, que se instruyera al jurado

sobre el delito de homicidio voluntario. *Pueblo* v. *Prados García*, 99 D.P.R. 384, 395 (1970).

2.—Que el tribunal juzgador incidió en el enfoque y tratamiento dado a la defensa de locura.

3.—Que el veredicto del jurado es erróneo pues niega al acusado el beneficio de la duda razonable y descarta robusta prueba técnica de defensa que la es a su vez del propio tribunal.

Discutiremos conjuntamente estos apuntamientos por estar estrechamente relacionados entre sí.

Ordenado el examen siquiátrico del apelante a petición suya, con el fin de determinar si podía distinguir entre el bien y el mal a la fecha de la comisión de los delitos que se le imputaron, fue examinado por un panel de cuatro siquiatras en varias ocasiones, la primera vez más de cuatro meses después de los hechos que dieron lugar a las acusaciones en este caso. En su informe de 15 de noviembre de 1966 el panel concluyó que "lo más probable" era que a la fecha de la comisión de los delitos, el apelante "no pudiera distinguir entre el bien y el mal" por estar padeciendo de una reacción esquizofrénica de tipo paranoide de evolución crónica en remisión de síntoma cuando se le examinó por lo que también concluyó que era procesable. En 5 de diciembre de 1966 el tribunal a quo ordenó se enviase copia de este informe a la defensa y al fiscal.

A petición del fiscal, el acusado fue sometido a otro examen siquiátrico por el Dr. Ramón Señeriz. Se le negó a la defensa los nombres de los testigos de cargo que el fiscal se proponía utilizar para probar la sanidad mental del apelante. Nada hay en la ley que imponga al fiscal tal obligación. Tampoco procedía que se leyera el informe del panel de siquiatras al jurado ya que no había sido admitido en evidencia. Los peritos firmantes del informe estaban disponibles para la defensa y en efecto testificaron a pedido de ésta.

■ Se arguye que el propósito de que se leyera el referido informe era trasladar el peso de la prueba al fiscal en cuanto al estado mental del apelante y que al no permitirse su lectura al jurado, se colocó el peso de tal prueba en el apelante. En contrario, informa el Procurador correctamente, que:

". . . Todas las personas son capaces de cometer crímenes. (Art. 39 del Código Penal, 33 L.P.R.A. sec. 85) . . . se presume que el acusado estaba en su sano juicio en el momento en que cometió el delito que se le imputó. En virtud de esa presunción el Ministerio Público no tiene que presentar prueba alguna para demostrar que el acusado estaba cuerdo en ese momento, *mientras no se ofrezca y reciba evidencia que pueda producir una duda razonable sobre la cordura.* Corresponde al acusado presentar esta evidencia si es que descansa en la incapacidad mental como defensa. Entonces *no antes,* es que el Ministerio Público está obligado a probar la sanidad mental al igual que cualquier otro hecho. *Pueblo* v. *Alsina,* 79 D.P.R. 46, 60–61 (1956); *Pueblo* v. *Rivera Raquel,* 95 D.P.R. 564 (1967); *Molina* v. *Jefe Penitenciaría,* 96 D.P.R. 191 (1968); *Pueblo* v. *Tribunal Superior,* [92 D.P.R. 116 (1965)]. El récord revela que el procedimiento seguido en el tribunal sentenciador se ajustó a las exigencias de esta norma." (Énfasis en el original.)

En apoyo de este apuntamiento arguye, además, el apelante que el tribunal juzgador incidió al no permitir que los siquiatras de la defensa hiciesen referencia al contenido de los informes médicos, clínicas e historial del paciente; que esta determinación privó al apelante "de llevar con más contundencia ante los señores del jurado la legitimidad de su insanidad que data de años como lo atestiguan los récords de varias instituciones, entre otras el Hospital Walter Reed, de Washington." No tiene razón.

■ Bajo la disposición del Art. 19 de la Ley de Evidencia (32 L.P.R.A. sec. 1662), al efecto de que un testigo sólo puede declarar sobre hechos que le constan personal y directamente, se permite al perito expresar su opinión, fundada en sus conocimientos especializados sobre la materia en controversia

y que sea pertinente a la misma. Su opinión debe estar basada en sus conocimientos y observaciones propias o en testimonios prestados ante el tribunal por otros y en prueba documental, oída, o leída por él, y no en conocimiento obtenido de informes rendidos por otros fuera del tribunal pues en este caso la opinión se basaría en prueba de referencia.

■ Es doctrina establecida que cuando está en controversia el estado mental de un acusado, el perito médico no puede basar su opinión en informes y conclusiones de otras personas desconocidas por el jurado y no sostenidas por la prueba, o en informes de otros médicos, o récords de hospital, o en investigaciones de empleados del hospital, o en récords de la oficina del fiscal o en reseñas del juicio publicadas por la prensa, que no han sido admitidos en evidencia. *City of Laurel* v. *Upton,* 175 So.2d 621, 625 (Miss. 1965); *Gillespie Land and Irrigation Co.* v. *González,* 379 P.2d 135, 141 (Ariz. 1963); *Baumhoer* v. *McLaughlin,* 205 S.W.2d 274, 280 (Mo. App. 1947); *State* v. *Gevrez,* 148 P.2d 829, 831–832 (Ariz. 1944).[1]

La prueba en cuanto al estado mental del apelante fue conflictiva. Los siquiatras de la defensa testificaron que lo más probable era que a la fecha de la comisión del delito el apelante no pudiera distinguir entre el bien y el mal. Estos peritos al examinar al apelante más de cuatro meses después de los hechos concluyeron que entonces no era procesable. No fue hasta después del 13 de septiembre de 1966, cuando a virtud de una orden del tribunal dictada en esta fecha, que el panel de siquiatras rindió su informe (de 15 de noviembre de 1966) al efecto de que lo más probable era que a la fecha de los hechos el apelante no podía distinguir entre el bien y el mal.

Por parte del ministerio público testificó el Dr. Señeriz que para poder determinar la sanidad de una persona en

---

[1] Véanse, además, *State* v. *Layton,* 14 A.2d 771, 773 (N.J. 1940)— *affirmed* 21 A.2d 732; *People* v. *Keough,* 11 N.E.2d 570, 572 (N.Y. 1937); *Ingles* v. *People,* 6 P.2d 455, 458–459 (Colo. 1931).

cierta fecha, había que examinarlo inmediatamente antes o después de dicha fecha por lo que él no podía opinar sobre esta cuestión ya que lo examinó más tarde. Véase, *Molina* v. *Jefe Penitenciaría*, 96 D.P.R. 191, 199 (1968). Pero el Dr. Juan Luis Mella, quien examinó al apelante tres días después de los hechos al ser ingresado como paciente en el Hato Rey Psychiatric Hospital (antes Clínica Juliá), dictaminó que, aunque padecía una reacción esquizofrénica crónica, no diferenciada, severa, el apelante podía distinguir entre el bien y el mal en la fecha de los hechos. No obstante el largo e intenso contrainterrogatorio a que fue sometido, se reafirmó en dicha opinión.

■ Evidentemente el jurado al dirimir el conflicto en esta prueba pericial dio mayor peso probatorio al testimonio del Dr. Mella cuya evaluación sobre la cordura del apelante fue la más próxima a la fecha de la comisión del delito. Tal apreciación no es errónea en ausencia de una demostración de que al hacerla se actuó con prejuicio, pasión o parcialidad. *Pueblo* v. *Pantoja Aguayo*, 97 D.P.R. 236, 239, 240 (1969); *Pueblo* v. *Rivera Raquel*, 95 D.P.R. 564, 570 (1967); *Pueblo* v. *Sánchez*, 79 D.P.R. 116 (1956).

■ 4.—Que incidió el tribunal de instancia al informar al jurado al finalizar sus instrucciones en que "Por el resultado de la prueba practicada en el curso de este juicio ustedes pueden llegar a uno de tres posibles veredictos, a saber: (1) No culpable por razón de locura; (2) Culpable de asesinato en primer grado; o, (3) Culpable de asesinato en segundo grado."; que erróneamente, como última instrucción al jurado, les informó que "Resumiendo, tienen ustedes tres posibilidades de veredictos. . . ." indicándoles que estos tres posibles veredictos eran, culpable de asesinato en primer grado, culpable de asesinato en segundo grado, o, no culpable por razón de locura; que debió instruir al jurado que podía "declarar" al apelante no culpable del delito que se le imputaba independien-

temente de la defensa de locura. La instrucción en cuestión no fue oportunamente objetada, ni se solicitó entonces una instrucción adicional al efecto de que otro posible veredicto era el general de no culpable, no obstante haber inquirido el tribunal si la defensa tenía alguna otra excepción a las instrucciones en adición a las tres que sugirió el apelante (entre las cuales no se incluyó ésta que se refiere a los tres posibles veredictos) y que se consideraron por el tribunal quien informó que las denegaba por distintas razones.

En vista de que no se objetó la referida instrucción oportunamente, como lo requiere la Regla Núm. 137 de las de Procedimiento Criminal, debemos resolver, no obstante, si el dar la instrucción en cuestión constituyó un error fundamental. Véase, *Pueblo* v. *Serrano Nieves*, 93 D.P.R. 56 (1966).

Los hechos ocurrieron en 5 de junio de 1965. En el acto de la lectura de la acusación la representación legal del apelante solicitó 15 días para hacer alegación y solicitó que el apelante fuese sometido a un examen siquiátrico para determinar "Si a la fecha en que se alega cometió los hechos que se le imputan en la acusación podía distinguir entre el bien y el mal."

Sometido a examen siquiátrico, el panel de siquiatras informó en 28 de octubre de 1965 que estaba incapacitado para ser sometido a un proceso. Fue ingresado en el hospital de siquiatría en Río Piedras. En 16 de junio de 1966 el panel lo encontró en condiciones mentales de ser procesado. En 13 de julio de 1966 fue puesto en libertad bajo fianza. En 15 de noviembre de 1966 el panel rindió el informe de que el apelante no podía distinguir entre el bien y el mal en la fecha de los hechos del delito. Señalado el caso para juicio en 13 de marzo de 1967, el apelante notificó al tribunal de instancia y al fiscal que "intenta establecer en juicio—entre otras—la defensa de incapacidad mental en el momento de la alegada comisión de los delitos imputádosle."

En el acto del juicio y una vez seleccionado el jurado y leída la acusación, a preguntas del juez sentenciador, la

defensa hizo alegación de inocencia. Al terminar el fiscal de pasar su prueba, la representación legal del apelante declaró que "de acuerdo con la teoría de la defensa es que de haber el señor acusado, Jacobo Reyes Acevedo, cometido algo de alguna naturaleza, fuera la que fuera, en la ocasión en que se le imputa la acusación por el ministerio fiscal, lo hizo estando mentalmente incapacitado, sin poder distinguir entre el bien y el mal. Sin saber lo que hacía, sin estar cuerdo, sin ser responsable de sus actos y estando loco."

Antes de la impugnada instrucción sobre los tres veredictos indicados, el tribunal de instancia instruyó al jurado que: "Hon. Juez:

.     .     .     .     .     .     .     .

De lo anterior, es claro que en todo asesinato, sea de primero o segundo grado, tiene que probarse, fuera de duda razonable, que

(1) se dió muerte ilegalmente a un ser humano.

(2) que ese acto se cometió con malicia premeditada.

.     .     .     .     .     .     .     .

Ninguna persona podrá ser convicta de asesinato, a menos que la muerte de la persona que se alegare haber sido muerta, y la causa que produjo la muerte, resultaren probados como actos independientes, el hecho de la muerte en sí, por medio de pruebas directas; la causa de la muerte, por medio de pruebas que no dejen lugar a duda razonable.

.     .     .     .     .     .     .     .

El primer deber del Jurado es determinar cuidadosamente, oídos los testimonios de los testigos, si las circunstancias inculpatorias de las cuales pueda inferirse la culpabilidad, resultan probados fuera de toda duda razonable . . . El problema es si la evidencia, bien sea circunstancial o directa, establece la culpabilidad del acusado fuera de duda razonable. La culpabilidad del acusado debe probarse fuera de toda duda razonable. Y cuando existe esa duda razonable, debe absolverse al acusado. Duda razonable no es meramente una duda posible. Existe duda razonable cuando después de un cuidadoso examen, análisis y comparación de toda la prueba, queda el ánimo de los Jurados en tal situación que no

puedan decidir si tienen una firme convicción o certeza real respecto a la verdad de los hechos envueltos en la acusación. . . . En los casos criminales la ley presume que el acusado es inocente, hasta tanto se le prueba lo contrario de modo satisfactorio y por evidencia competente. Esta presunción de inocencia acompaña al acusado durante el juicio y el Jurado debe tenerlo presente también al deliberar. . . . el Fiscal está en la obligación de establecer su culpabilidad más allá de una duda razonable . . . ."

En *Commonwealth* v. *Edwards*, 147 A.2d 313 (Pa. 1959), a la acusación de asesinato se adujo la defensa de insanidad. El acusado fue convicto de asesinato en primer grado. Se instruyó al jurado que si encontraba probada la defensa de insanidad debía rendir un veredicto de no culpable; que si creía que esa defensa no se había probado por una justa preponderancia de la prueba, entonces tenía el jurado que fijar el grado del delito mediante veredicto de culpable de asesinato en primer grado o en segundo grado o de homicidio voluntario. Les instruyó que podían traer "uno y solo uno" de cinco veredictos que les enumeró, uno de los cuales era el de no culpable debido a insanidad. No incluyó el simple veredicto de no culpable. El acusado admitió en tres ocasiones distintas, haber matado a la víctima: primero, a un detective a quien relató los detalles del crimen, luego, en una confesión escrita, y, después, desde la silla de testigos cuando testificó que planeó matar a la víctima y cómo lo hizo en todos sus detalles.

Sin embargo, una mayoría del Tribunal Supremo de Pennsylvania concluyó que el omitir una instrucción sobre un veredicto de no culpable constituyó un error fundamental que requería la revocación de la sentencia y un nuevo juicio.

Contestando el argumento de que es ridículo exigir una instrucción sobre presunción de inocencia cuando el acusado ha admitido las circunstancias del delito, el tribunal, en *Edwards*, supra, a la pág. 314, dijo que:

"La historia ha demostrado que ha habido muchos llamados casos ridículos en que personas inocentes han sido acusadas de delito y a menudo injustamente convictas."

Añadió que:

"Pero debe, a pesar de eso, dejarse al jurado el decidir si un asesino confeso tuvo o no tuvo justificación o excusa para lo que hizo . . . . La presunción de inocencia no es meramente una figura de papier-maché para ser mostrada dramáticamente en el tribunal; es una realidad sin la cual los juicios son meras actuaciones teatrales en que el veredicto se encuentra en el bolsillo del juez antes de tomarse juramento al jurado. . . . . Permitir, sin que se corrija, una notoria omisión en las instrucciones del juez significaría que en juicios posteriores donde la evidencia para sostener la convicción no sea tan preponderante, como la considera el fiscal y el tribunal de instancia en este caso, una omisión similar no podría objetarse ya que se citaría este caso como precedente. . . . La ley de Estado coloca en manos del jurado la responsabilidad exclusiva de decidir sobre la culpabilidad y el tribunal no debe restringir las posibles conclusiones del jurado a un número que excluye la muy importante alternativa de no culpable. De lo contrario, la ley estaría autorizando al tribunal de instancia a dar instrucciones obligatorias a favor del Estado, lo que es no solo 'irreflexivo' sino también 'inconcebible'."

Aunque en *Edwards*, supra, a la página 6 de sus extensas instrucciones, el tribunal dio una al efecto de que el Estado debe probar la culpabilidad más allá de duda razonable y que nunca puede haber convicción a menos que la culpabilidad se pruebe hasta ese extremo y que de no probarse así, el veredicto debe ser de no culpable, en la página 64 aparece la instrucción impugnada. Además, el tribunal enumeró al jurado los cinco posibles veredictos entre los cuales no aparece el de no culpable. De ahí que el tribunal dijera, a la página 318, que "El jurado sólo podía considerar con gran alivio las palabras finales del tribunal que les instruyó con la mayor claridad, lo que debía de hacer. Lo que dijo antes se fundió en esta directriz absoluta. El juez mismo prácticamente invalidó lo que había dicho antes sobre un posible veredicto de no culpable."

La opinión disidente en *Edwards*, supra, se basa en que las instrucciones deben considerarse en conjunto y no debe revo-

carse una convicción a base de partes aisladas de las instrucciones; que el acusado había admitido que mató a la víctima deliberada y voluntariamente y su única excusa y defensa era la locura.

En *Braley* v. *Gladden*, 403 F.2d 858 (9th Cir. 1968), al revocar la orden del tribunal federal de distrito que desestimó el recurso de hábeas corpus, el Tribunal de Apelaciones del Noveno Circuito Federal ordenó que se retuviese sin tramitar el recurso con el fin de dar una oportunidad al Estado de conceder un nuevo juicio al acusado.

Acusado Braley en este caso de asesinato en primer grado, en el juicio en el tribunal estatal aquél no negó el asesinato. Insistió, en su defensa, que en el momento de los hechos estaba completamente ebrio y, en la alternativa, que estaba legalmente loco. El juez sentenciador no instruyó al jurado que diez de ellos podían rendir un veredicto de no culpable. Les instruyó sobre el peso de la prueba del fiscal, la presunción de inocencia y sobre los veredictos de culpable de los distintos posibles grados del delito.

El Tribunal Federal de Apelaciones, citando con aprobación a *Edwards*, supra, dijo:

"Todos reconocemos la influencia profunda del juez sentenciador sobre el jurado. . . . Por lo tanto la inadvertencia en no suministrarle el formulario de veredicto de no culpable junto con los formularios contrarios constituyó, en efecto, un comentario severamente adverso del tribunal, una insinuación impermisiblemente grave de una actitud judicial hacia la cuestión de culpabilidad o inocencia. Por lo tanto, concluimos que la influencia ejercida por el juez sentenciador, aunque no intencional, y probablemente como resultado de una inadvertencia del secretario, fue tan significativamente irregular que requiere un nuevo juicio." Véase, *People* v. *Way*, 177 N.W.2d 729 (Mich. 1970).

■ Lo significativo del caso ante nos es que, no obstante las instrucciones correctas, la última instrucción que se da al jurado, por vía de *Resumen* de todo lo previamente informado es que sólo podían rendir uno de tres veredictos entre

los cuales se incluyó el de no culpable por razón de locura y no se incluyó el veredicto simple de no culpable. Esta última instrucción en efecto invalidó las anteriores que eran inconsistentes con ésta. Constituyó una directriz al jurado de que si no podía concluir que al momento de realizar los hechos del delito el apelante no podía distinguir entre el bien y el mal, necesariamente debía rendir un veredicto de culpabilidad en uno de los dos grados del delito de asesinato. Esta instrucción tenía el efecto de negarle al jurado la facultad que tiene, y que no puede restringírsele, limitársele o negársele en forma alguna, de apreciar toda la prueba y no creer la prueba de cargo y, en tal virtud, de rendir un veredicto de no culpable. Concluimos, por lo tanto, que la referida última instrucción al jurado lesionó derechos fundamentales del apelante.

En vista de lo que acabamos de exponer, *se revocará la sentencia dictada en este caso por el Tribunal Superior, Sala de Caguas, en 9 de junio de 1967, y se devuelve el caso a dicho tribunal para celebración de nuevo juicio.*

El Juez Presidente, Señor Negrón Fernández, no intervino. El Juez Asociado, Señor Dávila, concurre en el resultado.