**UNITED STATES of America**

v.

**Paul K. STROTHER, Appellant.**

**No. 77–1432.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 6, 1977.

Decided April 13, 1978.

Rehearing Denied May 9, 1978.

398

Michael S. Helfer, Washington, D. C. (appointed by this Court) for appellant.

E. Thomas Roberts, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, and Joseph F. McSorley, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before WRIGHT, Chief Judge, and McGOWAN and WILKEY, Circuit Judges.

Opinion for the Court filed by McGOWAN, Circuit Judge.

McGOWAN, Circuit Judge:

Appellant was convicted in the District Court, after a trial to the court on stipulated facts, of possession of an unregistered firearm. 26 U.S.C. § 5861(d) (1970). On appeal he asserts errors successively involving (1) the issuance of the search warrant leading to his arrest and indictment; (2) the process observed in initiating the trial by the judge on a stipulated record; and (3) the imposition of sentence. For the reasons hereinafter appearing, the judgment appealed from is affirmed.

I

Appellant's principal contention relates to the search warrant. It is that the warrant was invalid because it was issued by a United States Magistrate, appointed for the District Court for the District of Columbia, at her home in Virginia. We turn first to the circumstances culminating in this action.

Late in the evening of December 22, 1976, Detective David Cassidy of the Metropolitan Police Narcotics Squad made a telephone call to Assistant United States Attorney Joseph McSorley. Cassidy related that he had just obtained from an informant information about a heroin distribution operation currently being carried on in Apart-

ment 219 at 1444 Rhode Island Avenue, N.W., in the District of Columbia. Because the informant had reported that the heroin was to be divided up that evening, Cassidy said he needed a search warrant as soon as possible on an emergency basis. McSorley then called United States Magistrate Jean F. Dwyer, who had been designated at the time in question as the magistrate to handle emergency matters. McSorley, since time was of the essence, said that he would bring an affidavit by Cassidy supporting the application for a warrant to Magistrate Dwyer's home in Virginia for review by her. This was done, and equipped with the warrant authorized by Magistrate Dwyer, the police presented themselves at 1:00 A.M. at the apartment in question, and effected an entry under the authority of the warrant, finding appellant and two other persons therein. A search revealed a 12 gauge sawed-off shotgun, 15 rounds of 12 gauge shotgun shells, and various narcotics paraphernalia. Arrested and advised of his rights, appellant told the police that the gun was his.

After indictment, appellant moved to suppress the gun on the ground that Magistrate Dwyer was without authority to issue the warrant while physically outside the District of Columbia. The District Court ruled to the contrary and denied the motion.

Appellant's claim of error in this regard rests heavily upon language contained in the Federal Magistrates Act, his principal focus being upon the words (for which we supply emphasis) appearing in 28 U.S.C. § 636 (1970) as set forth below:

(a) Each United States magistrate serving under this chapter shall have *within the territorial jurisdiction prescribed by his appointment—*

(1) all powers and duties conferred or imposed upon United States commissioners by law or by the Rules of Criminal Procedure for the United States District Courts;

In the case of search warrants, the foregoing congressional grant has been implemented by Rule 41(a) of the Federal Rules of Criminal Procedure:

Authority to Issue Warrant. A search warrant authorized by this rule may be issued by a federal magistrate or a judge of a state court of record *within the district wherein the property sought is located,* upon request of a federal law enforcement officer or an attorney for the government. (Emphasis supplied).

■ We think the language of the Rule, with its explicit reference to the location of the property in question, is significant for purposes of the problem before us. That language, in our view, is intended to make clear that the search warrant can only be operative in the territory in respect of which the issuing officer is clothed with judicial authority.[1] It is not intended, we believe, to require that under all circumstances the physical acts involved in the issuance of a warrant be performed in that territory. The general principle that a judicial officer's writ cannot run outside her territorial jurisdiction is a far different thing from saying that in no circumstances can a judicial officer sign outside her jurisdiction a writ which runs within it.

■ Although the foregoing would appear to obtain in the case of judicial officers generally, it is apt in this context to remark that appellant's contention does not comprehend any claim that Magistrate Dwyer

---

1. This same preoccupation with the place where the warrant is to be executed rather than where it is physically issued is apparent from the general search warrant statute enacted by the Congress for the District of Columbia. 23 D.C.Code 521(a) provides:

Under circumstances described in this subchapter, a judicial officer may issue a search warrant upon application of a law enforcement officer or prosecutor. A warrant may authorize a search to be conducted anywhere in the District of Columbia and may be executed pursuant to its terms.

The local rule of the District Court articulating the powers entrusted to the magistrates (Rule 3–8(a)) says only that

The United States Magistrates appointed by this court pursuant to 28 U.S.Code § 631 shall have the duty and the power to:

\* \* \* \* \* \*

(3) Issue search warrants.

should not have been living outside the geographical limits of the District of Columbia. The District has long been unique in that its federal judicial officers are not required to reside within its boundaries. 28 U.S.C. §§ 44(c), 134(b).[2] Thus the only question going to the validity of the warrant authorized by Magistrate Dwyer in her suburban home across the Potomac in Virginia is whether that act was an appropriate one for performance by her at that location.

We deal here only with the obtaining of a search warrant; and we decide nothing beyond that particular process. It is an *ex parte* proceeding in which the applicant is authorized to communicate directly with the judicial officer, and in which the judicial officer is authorized to act solely on the basis of the representations made by the applicant. It is perhaps foremost in the kinds of matters necessitating a system in which one of the three federal magistrates in this jurisdiction is always under designation for around-the-clock availability. Needs for warrant authorization arise at all hours of the day and night, and there is nothing about the process that precludes its performance in the judicial officer's home. Indeed, Congress's recent enactment amending Rule 41 of the Federal Rules of Criminal Procedure to authorize telephonic application for, and receipt of, warrant authorization makes sense only if it be thought to embrace such application to the judicial officer at his home as well as his office.[3] Had that Rule been in effect when the warrant challenged here was issued, even the potentially critical lapse of time involved in going to Magistrate Dwyer's home could have been avoided.

Judges have proverbially signed papers or done other acts outside their territorial jurisdiction which have effect—and can only have effect—within those respective jurisdictions; and Congress may reasonably be thought to have enacted the Federal Magistrates Act against this background of accepted practice. Whatever may be the case with respect to the conduct of adversary proceedings—and there surely are obvious limitations on the judge's power to hold these wherever he pleases—the wholly *ex parte* process of warrant authorization presents no such problems and is not, we hold, to be comprehended within the excessively literal reading of the Federal Magistrates Act which appellant presses upon us. A Congress which has signified its interest in swift and efficient law enforcement by authorizing the telephone warrant cannot, absent a clearer purpose to do so than is visible from the language it used, be taken to have forbidden what the magistrate did in this instance.

This court *en banc* has heretofore contemplated, with seeming approval when it is remembered that our federal magistrates do not have to live in the District, the very thing that was done here. In *Dorman v. United States,* 140 U.S.App.D.C. 313, 435 F.2d 385 (1970), after referring to our frustrations and those of the law enforcement officers seeking warrants caused by the lack of easy and certain access to magistrates at all hours and on weekends and holidays, we noted with satisfaction (140 U.S.App.D.C. at 323, 435 F.2d at 395):

> The magistrates have set up a systematic schedule for availability *at home,* where a duplicate set of seals is maintained. . . The procedure contemplates screening by

---

2. For many years, first by judicial decision (*United States ex rel. Laughlin v. Eicher,* 56 F.Supp. 972 (D.D.C.1944); *see Pyle v. United States,* 81 U.S.App.D.C. 209, 156 F.2d 852 (1946)) and subsequently by statute, both federal and local judges in the District were exempted from any residence requirement. The local judges lost that exemption in 1973 with the enactment of the District of Columbia Self-Government and Governmental Reorganization Act, 87 Stat. 774, except for those appointed before that statute became effective in 1975.

3. Rule 41(c)(2) provides that "a Federal Magistrate may issue a warrant based upon sworn oral testimony communicated by telephone or other appropriate means." This rule was enacted by Congress, pursuant to its plenary legislative power, in Pub.L. 95–78 (approved July 30, 1977), 91 Stat. 319, for the purpose of enabling warrants to be procured as expeditiously as possible.

Assistant United States Attorneys before law enforcement officials make such application to the magistrate *at home* . . (emphasis supplied).

Subsequently we expressed wonderment as to why the process could not, even in the absence of explicit statutory authorization, be speeded up even further by means of telephonic communication between the applicant and the magistrate at home. *See United States v. Johnson,* 182 U.S.App.D.C. 383, 561 F.2d 832 (1977), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2953, 53 L.Ed.2d 1080 (1977); *United States v. Robinson,* 174 U.S. App.D.C. 351, 358, 533 F.2d 578, 585 (*en banc*), *cert. denied,* 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976). Congress has now made it plain, if indeed it was not before, that that approach is proper; and we contemplate with satisfaction an end to the long procession of cases in which the prosecutor has been before us pleading exigent circumstances as the justification for failure to seek a warrant.

Appellant has seized upon a matter appearing in the record in *Johnson* as in substance an admission by the Government that the magistrate must be physically within the boundaries of the District in order validly to issue a warrant. There was testimony in that case that, at the time in question, the prosecutor was adhering to a practice of meeting or bringing the magistrate at or to some public place at a point just inside the District line where the warrant was issued—a practice which has apparently been abandoned in favor of going to the magistrate's home outside the District. We think this only demonstrates that the Government was acting out of an excess of the same caution which characterized its reluctance to experiment with telephonic warrants. In any event, we are not dis-

posed to attribute to the unnecessarily cumbersome—and justifiably short-lived—precaution showing up in *Johnson* the significance appellant claims for it.

We are in full agreement with a recent decision by the Superior Court of the District of Columbia involving the issuance, in Montgomery County, Maryland, of a search warrant by a Superior Court Judge for execution in the District of Columbia. *United States v. Coates,* D.C.Crim. No. 52181–77, decided January 12, 1978. In an opinion reported in 106 Daily Washington Law Reporter (Number 34, page 313), Judge Ugast held that there was "nothing in the statutes or the case law which so limits a judge's power to authorize a search warrant as long as execution occurs in the jurisdiction in which the judge is empowered to act." [4]

The court correctly characterized cases like *Weinberg v. United States,* 126 F.2d 1004 (2d Cir. 1942), and *Application of Houlihan,* 31 F.R.D. 145 (D.N.D.1962)—also relied upon by appellant in the appeal before us—as inapplicable because they dealt with search warrants issued by a judge in his own jurisdiction but for execution in another location where he possessed no authority whatsoever. And it also accurately appraised cases like *In re American Home Furnishers' Corp.,* 296 F. 605 (4th Cir. 1924), *cert. dismissed,* 266 U.S. 640, 45 S.Ct. 122, 69 L.Ed. 483 (1924); *United States v. Goldstein,* 271 F. 838 (8th Cir. 1921), and *Apgar v. United States,* 255 F. 16 (5th Cir. 1919), *cert. denied,* 250 U.S. 642, 39 S.Ct. 492, 63 L.Ed. 1135 (1919), as supporting the proposition that, "in order to prevent delay and promote justice, a judge outside the geographical confines of his jurisdiction is empowered to take action as a nonadversary stage on matters coming within the pur-

---

**4.** The relevant statute provides that "judges of the Superior Court may, at any time, . . . issue warrants for arrest, search or seizure . . . in connection with crimes and offenses committed within the District of Columbia . . . ." 11 D.C.Code § 941. By Rule (12–I(c)) the Superior Court has provided for a system of scheduling emergency judges for matters "requiring immediate judicial attention at a time outside the regular business hours,"

and the Chief Judge is directed to "publish an order listing the names and residential addresses and telephone numbers of the judges on emergency assignment during the term of the order." This rule was in being when the judges of the Superior Court were not required to reside within the boundaries of the District of Columbia, and it continues to be effective as to those judges who continue to be exempt from that requirement.

view of his authority in his own jurisdiction. . . . ." We share Judge Ugast's conclusion:

The interests of justice would not be served in any obvious way by demanding that a judge on emergency duty at home or otherwise available in the metropolitan area journey to the District line to review a search warrant. Rather, the strong judicial policy favoring search warrants could be frustrated by such a requirement [footnote omitted].

Of course, we deal here only with an act by a Federal magistrate, and the question is whether she exceeded in this instance the limits of the power vested in her by Congress. We see no purpose in pursuing the question of the powers possessed by federal judges who are designated to sit in jurisdictions other than their own. § 28 U.S.C. § 636; and see 28 U.S.C. § 296. It is obvious that when Congress took the step of creating federal magistrates it was careful to define, in both statute and rule (see pp. ——–—— of 188 U.S.App.D.C., pp. 399 of 578 F.2d supra), the territorial areas in which the force of their authority could be brought to bear. This explains the presence of the words relied upon so heavily by appellant, and upon the construction of which the issue before us turns.

We read those words as an identification of the area within which a magistrate's warrant can validly take effect, and not as a prohibition upon the magistrate's signing that warrant outside the area so defined. Such a construction is, we believe, wholly in keeping with the congressional purpose to provide speedy and efficient procurement of warrants for the protection both of those against whom they are directed and of the public at large.

## II

█ Appellant's second challenge to his conviction rests upon the claim that his submission to a trial by the court was substantially equivalent to a guilty plea; and that, accordingly, the procedures described in Rule 11, F.R.Cr.P., should have been fol-lowed. In particular, he asserts that our earlier decisions in United States v. Brown, 138 U.S.App.D.C. 398, 428 F.2d 1100 (1970), and United States v. Dorsey, 146 U.S.App. D.C. 28, 449 F.2d 1104 (1971), mandate reversal on this ground.

We look first to the factual context from which this contention emerges. After appellant's arrest, a preliminary hearing was held before a magistrate, at which appellant was present and represented by counsel. At that hearing Detective Cassidy testified with respect to the circumstances of the search and the seizure of the gun, and appellant was bound over for the grand jury. When an indictment was returned, and appellant was arraigned upon it, he indicated at that time through counsel that, if he was not successful on the motion to suppress because of the asserted invalidity of the search warrant, in all likelihood he would stipulate to a trial to the court and then would appeal from any judgment of guilty that might be entered.

When the motion to suppress was heard and denied, appellant's counsel reported to the court that he had discussed the matter with appellant and that the latter was prepared "to have stipulated the trial, and also waive his right to a jury." The court then directed that, since no written stipulation was in being, the prosecutor should "outline the stipulation." The court then proceeded as follows:

THE COURT: Mr. Strother, Come forward please.

[Defendant approached the podium.]

THE COURT: Under the Constitution of the United States, under the charge against you, which is a felony, you have the right to a trial by jury, which you may if you wish waive your right to trial by jury and have a trial by the Court.

Is it your desire to waive your Constitutional right to a trial by jury and have a trial by Court?

DEFT. STROTHER: Yes, it is.

THE COURT: All right.

After the prosecutor made a statement of the facts he expected to prove if the case had gone to trial, the following occurred:

THE COURT: Now, Mr. Strother, you have heard the facts outlined by the United States Attorney, which your counsel has admitted as being true, that is, *that if these witnesses were put on the stand they would testify as indicated, and that the exhibits would show what they purport to show.* (Emphasis added).

Do you so stipulate?

DEFT. STROTHER: Fairly much so, Your Honor.

THE COURT: Well, where do you disagree?

DEFT. STROTHER: Well, I disagree with the fact that when I came in I said I lived there, because the officer asked me who I was, so I told him who I was, not that I lived there. If someone asks you, you know, who you are, you wouldn't say I lived in such and such a place. And the fact that—there was something else that he said.

That then they began the search, because when I came in the apartment was, you know, already disarrayed, torn apart, as I came in.

So there is just a few minor discrepancies, and as far as their statement is concerned—

THE COURT: Except for those, do you stipulate as to *what they say* the facts are? (Emphasis added).

DEFT. STROTHER: Yes.

In *Brown,* this court said (at 400 of 138 U.S.App.D.C., at 1102 of 428 F.2d):

. . . We hold that Rule 11 is inapplicable in this case since a plea of guilty is not involved. We find, however, that the considerations which support the requirement of Rule 11 that the trial judge address the defendant personally are present in the limited circumstances of this case, those limited circumstances being the mental condition of the defendant and the stipulation of counsel admitting all of the acts charged. We therefore hold that, in the limited circumstances of this case, the trial judge here should have addressed the defendant personally before accepting the stipulation. While we apply our ruling in this case, it will not be applied otherwise except in cases tried after this date.

In *Dorsey,* this court referred to its earlier ruling in *Brown* as having "held that the requirements of Rule 11 itself are triggered only by an explicit plea of guilty . . . ." 146 U.S.App.D.C. at 31, 449 F.2d at 1107. It went on to say that "the principles underlying Rule 11 may require similar inquiries where appellant's claim is one of equivalency." *Id.* It immediately distinguished *Brown* by noting that *Dorsey* did not involve any question of mental condition. Rather, it said (146 U.S.App.D.C. at 32, 449 F.2d at 1108):

. . . the situation appears to be one where the evidence of the crucial element of the offense—possession of a dangerous weapon—had already been given in an adversary context and the trial stipulations relate to facts which would be of significance only if the court found, on the basis of the special officer's testimony, that the appellant was carrying the weapon to which the stipulations relate. Thus, unlike the situation in *Brown,* there was not "an admission by defendant of *all* of the conduct charged to him as a crime." That appellant's case appears so weak as to suggest the equivalence of a guilty plea is due to the facts as developed in the special officer's testimony, not to the stipulations made at the trial. (footnotes omitted).

*Brown* is, of course, quite different from the case before us, as it was from *Dorsey,* in that it involved a defendant who was admittedly suffering from a mental disorder and who, relying on an immunity defense, stipulated to having committed all the acts charged in the indictment. It was by reference to these special circumstances that the court held that "the trial judge should address the defendant personally in determining whether the waiver is made voluntarily with understanding of the consequences of her act. . . ." At 401 of 138 U.S.App. D.C., at 1103 of 428 F.2d.

In sharp contrast with *Brown,* this case is very much like *Dorsey.* The defendant in the latter had made a pretrial motion to

suppress a gun, which he was charged with carrying unlawfully, on the ground of invalidity of the arrest and ensuing search. There was an evidentiary hearing at which the arresting officer testified, in an adversary setting, as to finding the gun in the defendant's possession. When the motion was denied, the defendant waived trial by jury and made certain other stipulations. With respect to the waiver, the defendant was personally addressed by the court in accordance with Rule 23(a), F.R.Cr.P. The critical testimony as to possession given by the police officer was stipulated as incorporated in the trial record by reference.[5]

This court held in *Dorsey* that there was no equivalence to a guilty plea because the defendant had never stipulated to the truth of the officer's testimony, leaving it essential to his conviction that the court find, on the basis of the officer's testimony, the fact of possession, without which the other facts accepted by stipulation would be irrelevant. The close parallels to this case are obvious. Essential to appellant's conviction was that the trial court find the fact of possession. This could only be done from the testimony of the arresting officer, which had been given in the adversary context of the preliminary hearing and which, as we read the record, was not admitted to be true by appellant but which, as in *Dorsey,* was only stipulated to be included in the trial record. In putting the stipulation question to appellant, the trial court characterized its content as being "that if their witnesses were put on the stand they would testify as indicated . . . ", and a moment or so later, after appellant had pointed out what he characterized as "just a few minor discrepancies," the court's final query was, "Except for those, do you stipulate as to what they say the facts are?"

As in *Dorsey,* there is no question here but that the trial court made the requisite

Rule 23(a) inquiry of appellant with respect to his waiver of jury trial. Also as in *Dorsey,* the trial court could not have found guilt without passing upon the stipulated testimony as to possession. Like *Dorsey,* therefore, we do not find in the record before us the equivalence to a guilty plea requiring the further advices mandated by Rule 11.

Although neither the literal terms of Rule 11 nor our *ad hoc* implementation of the principles underlying it in *Brown* warrant our reversal of appellant's conviction in this case, we have a continuing concern with cases like this where it seems reasonably clear that appellant, and certainly his counsel, realistically viewed their hope of success as mainly residing in an appellate reversal of the trial court's denial of the pretrial motion to suppress. Although the acceptability to them of a trial to the court on stipulated evidence cannot in law be equated with a guilty plea, in these circumstances the prospects of victory at trial, as distinct from prevailing on appeal with respect to a legal point, were, at best, obscure.

It would appear, therefore, that waiver of jury trial in this context is freighted with what is perhaps more than ordinary significance, and the trial judge should arguably be at some special pains to satisfy himself that the defendant is fully informed about precisely what it is that he is giving up. One way of doing that would be to take heed of at least some of the advices enumerated in Rule 11(c). Not all of those are relevant or appropriate, and adaptation would be necessary, but some would be helpful in impressing upon defendant the significance of the choice he has purportedly made.[6]

Some effort by trial judges along these lines would not only eliminate appeal issues of the kind we now confront, but could also

---

**5.** The other stipulations were that (1) the defendant did not have a license to carry a gun, (2) the gun would test fire, and (3) the defendant did not own the premises of the liquor store where the arrest and search were made. The defendant did not testify, nor was any other evidence offered on his behalf.

**6.** On the record before us, paragraphs (4) and (5) of Rule 11(c) would be irrelevant. The first three items of that rule would, however, be useful, and especially paragraph (3) with its explicit statement of the rights which accompany trial by jury.

usefully provide a basis for the rulemaking machinery of the federal court system to consider, against a background of some experience, the formulation of a rule addressed explicitly to this phenomenon, which is a frequently recurring one. As the Government observed in its brief on this appeal (p. 17), it is "obviously preferable to have a procedure which would show clearly that a defendant understands the consequences of a stipulated trial. . . . "

### III

■ Appellant's third point on appeal goes only to the validity of his sentence. It derives from the circumstance that the pre-sentence report made an allusion to appellant as a "known heroin user and distributor. . . . "[7] The pre-sentence report itself indicated that appellant had no prior record of arrest or conviction in respect of a narcotics offense. The pre-sentence report had been made available in advance of sentencing to appellant's trial counsel. The latter stated in court at the time of sentencing that he had read the pre-sentence report, but in his representation to the court on appellant's behalf made no reference to the statements in question.

It is now represented to us by appellant's different counsel on appeal that appellant was unaware of this information in the pre-sentence report until it was brought to his attention by appellate counsel; and that he (appellant) denies that he was ever a heroin distributor. The sentencing judge gave no statement of reasons for the sentence he imposed, and therefore there is nothing to indicate whether he took this information into account in imposing sentence. In *United States v. Sheppard,* 149 U.S.App.D.C. 175, 462 F.2d 279 (1972), we confronted a similar situation. The pre-sentence report there stated that an FBI agent had told the Probation Office that the defendant had been charged earlier with a similar crime which the U.S. Attorney had decided not to prosecute. In imposing sentence the judge referred to this information and, without objection to it or denial of it by either appellant or his counsel, indicated that it weighed heavily with him in fixing sentence.

We said in *Sheppard* that, with a challenge to the accuracy of the information made for the first time on appeal, any vacation by us of the sentence "could be based only on speculation," and that any denial by the defendant-appellant "should be made in the first instance to the trial court." Accordingly, we affirmed the conviction "without prejudice to appellant's proceeding by means of motion for reduction in sentence under Fed.R.Crim.Pro. 35."

Vacation of sentence in the case before us would be even more speculative than it would have been in *Sheppard,* since there it was clear that the information in question had figured prominently in the determination of sentence. We do not know that here, any more than we know how appellant's claims of ignorance and untruthfulness will fare under adversarial inquiry in the District Court. Thus, in line with our disposition in *Sheppard* we affirm the judgment appealed from without prejudice to the filing by appellant, if he should be advised, of a motion to reduce sentence under Rule 35.[8]

*It is so ordered.*

---

7. Two references in this regard were made in the pre-sentence report. The first was that "Contact with the United States Attorney's Office indicated that Mr. Strother is considered to be a known heroin user and distributor, with knowledge of persons associated with the drug hierarchy in this area." The other was in the evaluation section in which the Probation Office said that "we are extremely concerned with the fact that the U.S. Attorney's Office has indicated that the defendant is both a drug user and distributor." No facts were recited as supporting these statements.

8. There is, of course, nothing new about the inclusion in a pre-sentence report of hearsay. But increasing doubt about this practice has given rise in the first instance to precautions necessitating that the defendant know of such matter and have an opportunity to comment on it. That opportunity was provided in this case by means of the trial court's making the pre-sentence report available to the defense in advance of sentencing. Appellant now tells us that he did not know of the presence of this

derogatory information in the report, but that is an assertion which can only be explored in the District Court.

The part of that information which appellant now denies, namely, that he was a heroin distributor, is tantamount to an assertion that he has committed other crimes. The courts are taking an increasingly dim view of the inclusion of this kind of hearsay in a pre-sentence report, as witness our citation in *Sheppard* of the Fourth Circuit's statement in *Baker v. United States*, 388 F.2d 931, 934 (1968), that "No conviction or criminal charge should be included in the report, or considered by the court, unless referable to an official record."

The American Bar Association Standards for Criminal Justice relating to Probation, in enumerating the items to be covered in a pre-sentence report, refer to "a full description of any prior criminal record of the offender." In the commentary on the meaning of "prior criminal record" as so used, the Advisory Committee asserts that it intended only "to include only those charges which have resulted in a conviction". The ABA's Standard in this respect merits careful consideration by the Probation Office in the preparation of future pre-sentence reports, and by the United States Attorney's Office in supplying information to that end.