**UNITED STATES of America ex rel. Theodore ROSS, Petitioner-Appellant,**

**v.**

**Gayle FRANZEN, Director, Department of Corrections, Dennis Wolff, Warden, Joliet Correctional Center, Respondents-Appellees.**

No. 80–1118.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 17, 1981.

Decided Jan. 13, 1982.

Rehearing and Rehearing En Banc Granted and Opinion Vacated May 3, 1982.

---

Michael Mulder, Asst. State Appellate Defender, Chicago, Ill., for petitioner-appellant.

Jack Donatelli, Asst. Atty. Gen., Chicago, Ill., for respondents-appellees.

Before PELL and CUDAHY, Circuit Judges and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

Petitioner Ross sought a writ of habeas corpus from the district court, alleging that the state trial court had abridged his constitutional rights by refusing to include a plain "not guilty" form among the verdict forms given to the jury. The district court dismissed the petition, finding presumptively correct under 28 U.S.C. § 2254(d), and unrebutted, certain findings of the state appellate court. We conclude that the district court erred in deferring to those rulings and find no justification in the record for the state trial court's failure to submit the not guilty verdict form. Accordingly, we reverse the judgment appealed from and remand the case with directions to order release of petitioner unless he is again brought to trial within the period defined in this opinion.

### Factual Background

The evidence giving rise to the state court conviction is detailed in the opinion of the Appellate Court of Illinois, *People v. Ross*, 63 Ill.App.3d 884, 20 Ill.Dec. 688, 380 N.E.2d 897 (1978), and we need only briefly summarize it here. The first prosecution witness, the victim's son, testified that on March 10, 1975, he discovered his mother's body in their apartment lying in a bathtub full of bloody water. She had apparently been beaten and stabbed several times. He told the jury that he summoned the police. He also said that his mother and petitioner Ross, whom she had known for several years, had frequently had coffee in the apartment together. The police chief then testified that he inspected the scene and, after conferring with neighbors, proceeded to locate Ross. He placed the petitioner under arrest and recovered a paper bag filled with damp clothes. According to the police chief, Ross was advised of his constitutional rights, taken to the place of the crime, then transported to the station house. After again being given *Miranda* warnings and signing a form indicating he understood them, Ross was interrogated by the police. Initially he made several conflicting statements, then was permitted to talk privately with his pastor and with his girlfriend. The police chief said that following further questioning the petitioner confessed to the murder. He also testified that he had personally known Ross for "quite some time" and that, in his opinion, Ross was able to conform his conduct to the requirements of the law on the day in question. Another witness, a pathologist, testified as to the nature of the injuries and the cause of the victim's death. Then the Assistant State's Attorney who had taken the confession was called by the prosecution to read it into evidence, which he did without objection by the defense. He further said that as a result of his conversations with Ross, he was of the opinion that petitioner was able to conform his conduct to the requirements of the law. At the close of the state's case, a defense motion for a directed verdict was denied.

Ross did not take the stand in his own behalf, but instead called several witnesses, including his mother, his girlfriend, three psychologists, and one psychiatrist. The testimony of each was essentially directed toward establishing that Ross suffered from mental illness.

At the close of the evidence, a conference on instructions was held in the judge's chambers. The state submitted four verdict forms to be given to the jury: (1) guilty; (2) not guilty; (3) not guilty by reason of insanity and in need of further mental treatment; and (4) not guilty by reason of insanity and not in need of further mental treatment. The following colloquy then ensued:

Court: "... Let's go over the verdicts now ... They brought up four verdicts, one for plain not guilty. I don't think you even want that in there, do you?"

Defense Counsel: "Yes, your Honor."

Court: "So he can walk out on the street without going to the hospital? Three verdicts will be given. No objections...." [1]

The simple not guilty form was eliminated and the other three forms were given to the jury with the instruction that:

"When you have unanimously agreed upon your verdict you will select the form which reflects your verdict and sign it as I have stated." [2]

A verdict of guilty of murder was subsequently returned. Ross was sentenced to a prison term of 100–150 years.

### State Appellate Court Proceedings

On appeal to the Illinois Appellate Court, petitioner argued, among other points, that the trial court erred in omitting the plain not guilty form from the verdict forms given to the jury. The court noted that the defense had failed properly to object to this matter at trial, but nonetheless proceeded to decide the issue on the merits. It wrote:

"From the opening argument of this case, through the testimony of the prosecution's witnesses, through the reading of the defendant's confession to the jury, through the testimony of the defense witnesses, through the conference on instructions, through the closing arguments, through the pre-trial and post-trial motions and liberal argument thereupon, *the question of fact as to whether or not the defendant had committed the acts in question which resulted in the death of the victim was never raised. Counsel for both sides, in effect, stipulated to the fact the defendant had committed the acts in question.* The only defense raised by the defendant's very able trial counsel was the issue of the sanity of the defendant

at the time of the commission of the acts.... While as a general rule, we could not condone the actions of the trial judge and counsel for the prosecution and defense in omitting a 'not guilty' verdict, given the peculiar set of facts presented by this record, we believe the trial judge acted correctly when he only gave the 'not guilty by reason of insanity' verdicts."

28 Ill.Dec. at 691, 380 N.E.2d at 901. (Emphasis added.)

Subsequently, the Illinois Supreme Court denied petitioner leave to appeal.

### District Court Proceedings

A petition for a writ of habeas corpus was thereafter filed in United States District Court for the Northern District of Illinois, alleging that the trial court's failure to submit the not guilty verdict form deprived the petitioner of his Sixth and Fourteenth Amendment rights to have a jury determine whether he was guilty of each element of the crime beyond a reasonable doubt. The district court held that on the instant facts there was no constitutional error. It reasoned that the Illinois Appellate Court's finding that "[Ross] never really questioned that he had committed the homicide" was entitled to a presumption of correctness under 28 U.S.C. § 2254(d) and that petitioner's arguments did not cast doubt on that presumption. The court also "accept[ed] as binding the finding of the state court that petitioner in effect stipulated to the commission of the acts in question," and therefore concluded that the state trial court did not err in submitting only the three forms. Accordingly, the petition was dismissed. This appeal was subsequently taken.

### The Merits [3]

#### I.

■ We note at the outset of our analysis that petitioner's failure to make a more

---

1. Abstract of Record, p. 176.

2. *Id.* at p. 15.

3. Respondents were never ordered to file a response in the district court and were unaware of the existence of the instant case until after the petition had been denied. They have analo-

formal objection to the alleged error at trial does not bar us from now addressing that issue, since the state appellate court decided the merits of petitioner's constitutional claim notwithstanding lack of preservation. A similar situation was recently before the Supreme Court in *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). There, a constitutional challenge to identification procedures not presented at trial was raised before and decided by the California Court of Appeals. The Supreme Court observed that "if the state appellate court . . . had declined to rule on the . . . issue because it had not been properly raised in the trial court, the federal court would have been altogether barred from considering it absent a showing of 'cause' or 'prejudice'." 449 U.S. at 547, 101 S.Ct. at 769. Nonetheless, although the Supreme Court resolved the merits differently from the Court of Appeals, it did not fault the Court of Appeals for considering the merits. *Cf. Franks v. Delaware*, 438 U.S. 154, 161–162, 98 S.Ct. 2674, 2679–80, 57 L.Ed.2d 667 (1978) (ruling by state's highest court left question open to federal review).

## II.

Petitioner argues, as he did below, that the trial court's action in refusing to tender the not guilty form to the jury and in instructing it to render a verdict consistent with one of the three forms it was given eliminated the possibility of a not guilty verdict and in that manner unconstitutionally directed a verdict against the petitioner. The district court rejected this contention because it found presumptively correct, under § 2254(d), two separate but interrelated "findings" of the state appellate court. The first, as stated in the state court opinion, was that "the question of fact as to whether or not [Ross] had committed the acts . . . which resulted in the death of the victim was never raised" at trial, 28 Ill.Dec. at 691, 380 N.E.2d at 901; the second was that "[c]ounsel for both sides, in effect, stipulated to the fact that

the defendant had committed the acts in question," *id.* We cannot agree with the district court's analysis, as will be shown by our discussion of § 2254(d) and its applicability to each of these state court rulings.

■ Section 2254(d) provides that "a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction . . . [and] evidenced by a . . . written opinion . . . shall be presumed to be correct" unless the applicant for a federal writ of habeas corpus can establish one of the enumerated causes for exception, among which is a showing that as a whole the state court record does not fairly support the finding of fact. This presumption of correctness applies to factual determinations made at the state appellate level where, as here, a claim not raised at trial has received plenary consideration as part of the formal appeals process. *See Sumner, supra*, 449 U.S. at 546, 101 S.Ct. at 768–69; *see also United States ex rel. Riley v. Franzen*, 653 F.2d 1153, 1156 n.7 (7th Cir. 1981) (citing *Sumner* for same proposition). The two rulings of the Illinois Appellate Court to which the district court deferred do not, however, come within the protective ambit of § 2254(d) because one was not a finding of fact but rather a conclusion of law or mixed determination of law and fact, and the other, to the extent it may be interpreted as a factual finding, is without support in the record.

The term "issues of fact," as used in § 2254(d) "refer[s] to what are termed basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators . . . .' *Brown v. Allen*, 344 U.S. 443, 506, 73 S.Ct. 397, 446, 97 L.Ed. 469 (opinion of Mr. Justice Frankfurter). So-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense." *Townsend v. Sain*, 372 U.S. 293, 309, 83 S.Ct. 745, 755, 9 L.Ed.2d 770 (1963); *see also*

gized their position on appeal to that of *amicus curiae* and have filed what they denominate as

an *amicus* brief.

*Brewer v. Williams,* 430 U.S. 387, 403, 97 S.Ct. 1232, 1241–42, 51 L.Ed.2d 424 (1977); *Cuyle v. Sullivan,* 446 U.S. 335, 341–342, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980).

Here, the finding that counsel had "in effect" stipulated to the commission of the acts was not an ascertainment of historical fact, nor a recital of actual events, as would have been the case if the court had stated that an express stipulation had been made, or listed the matters stipulated to. Rather, as the appellate court's use of the term "in effect" makes clear, it was an appraisal of the legal consequences of the conduct of the defense at trial. The court was saying, in other words, that the actions of petitioner's counsel were legally equivalent to a stipulation of guilt on all issues save insanity and sufficiently waived petitioner's Sixth Amendment rights to have those elements of the crime proved beyond a reasonable doubt. Plainly, this ruling was a conclusion of law, or at best a mixed determination of law and fact. It represented not a finding of the underlying elemental facts or a resolution of witness credibility, but instead the application of legal standards—e.g., those governing waiver of constitutional rights, *see Brookhart v. Janis,* 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 313 (1966);[4] *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) —to the historical facts of the case. *See Brewer, supra,* 430 U.S. at 395–397, 402–404, 97 S.Ct. at 1237–39, 1241–42 (conclusion that defendant waived his right to counsel not a "factual" determination within the meaning of § 2254(d)); *see also Cuyler, supra,* 446 U.S. at 342, 100 S.Ct. at 1715 (conclusion that lawyers undertook multiple representation not a "factual" determination within meaning of § 2254(d)); *Ruiz v.*

*Cady,* 635 F.2d 584, 588–589 (7th Cir. 1980) (whether witness' testimony at trial was consistent with witness' prior testimony at preliminary hearing not a "factual" determination within the meaning of § 2254(d)). Consequently, the state appellate court's finding that there had "in effect" been a stipulation to the doing of the acts does not enjoy a presumption of correctness under § 2254(d) and is open to review on collateral attack via a federal habeas petition.[5]

As to the other "finding" deferred to by the district court—namely, that "the question of fact as to whether or not [Ross] ... committed the acts ... was never raised" at trial—we find several problems. If this be deemed a finding, *cf. Cuyler, supra,* 446 U.S. at 341–342, 100 S.Ct. at 1714–15 it clearly was not supported by the record. In the first place, petitioner had pleaded not guilty, thereby raising all possible questions of fact. In the second place, although the defense did not introduce evidence that petitioner had not committed the acts, such failure is by no means a concession, and defense counsel had argued to the jury that the evidence of guilt was insufficient.

We find particularly significant, the closing argument of defense counsel which plainly shows that Ross did not concede commission of the offense but in fact challenged the state's evidence.[6] Counsel argued that there was no eyewitness evidence that Ross had been at the scene of the crime,[7] that there was no testimony showing that he had washed blood stains out of the damp clothes recovered at the time of the arrest,[8] that there was insufficient time for such laundering to have taken place,[9] and that in fact the only evidence of Ross' guilt was "really just a confession" which

---

**4.** "The question of a waiver of a federally guaranteed constitutional right is ... a federal question controlled by federal law." 384 U.S. at 4, 86 S.Ct. at 1247.

**5.** Whether Ross in fact waived his right to a jury decision as to the commission of the acts is discussed later in the text.

**6.** Counsel's argument that Ross did not commit the crime might plausibly have been even more

forcefully presented had the judge not already ruled that he would withhold the not guilty form.

**7.** Abstract of Record, at p. 222.

**8.** *Id.* at pp. 225–226.

**9.** *Id.* at p. 226, *see also id.* at pp. 227–229.

the jury did not have to believe.[10] If Ross had conceded the doing of the acts, there would have been no reason to make these arguments which plainly challenged the sufficiency of the state's evidence of the petitioner's guilt. Added to these statements on closing is the fact that counsel had cross-examined the state's witnesses and at one point succeeded in establishing that the victim's son had no recollection of his mother and Ross ever having had a disagreement.[11] That admission tended to show that it was unlikely that Ross had reason to perpetrate this violent crime, and presumably was elicited for the purpose of undermining the state's case against the petitioner. So too, it is difficult to understand the defense motion for a directed verdict at the end of the state's evidence as other than a challenge to the evidence of Ross' involvement in the crime, since up to that point in the trial there was no significant evidence tending to establish that Ross was mentally ill.

To be sure, the main thrust of the defense's case was to show that Ross was mentally incompetent and thus could not be found legally responsible for the homicide. That tactic did not preclude the defense from alternatively arguing—as it did—that, in fact, Ross did not commit the crime.

While the presentation of this alternative theory was not as robust as the insanity defense there is ample evidence that it was indeed urged,[12] and we see no reason to discount that effort. We conclude that the state appellate court's determination that petitioner never questioned at trial the doing of the criminal acts is without support in the record, and therefore hold that the district court clearly erred in deferring to that finding.

### III.

The issue still remains, however, as to whether the state trial court abridged Ross' constitutional rights by refusing to give the not guilty form to the jury. Essentially, the question here is whether Ross waived his right to a jury determination of all issues except sanity. Unless he did, there was nothing to relieve that state of its burden to prove each element of the crime beyond a reasonable doubt, *see In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and even an inadvertent failure to submit the not guilty form to the jury would require a reversal, *see Braley v. Gladden*, 403 F.2d 858 (9th Cir. 1968);[13] *Commonwealth v. Edwards*, 394 Pa. 335,

---

10. *Id.* at p. 241. the following excerpts from the record demonstrate that at several points counsel urged that the jury need not credit evidence tending to establish the petitioner's guilt: *"if* you ... believe the confession ...," *id.* at p. 226; *"if* you believe this evidence which is really just a confession ...," *id.* at p. 241; *"if* you believe ... that he stabbed a lady that was like a mother to him for no reason under the sun ...," *id.*; *"if* you believe that he beat her ...," *id.* (Emphasis added.)

Counsel attempted to explain Ross' confession in a manner consistent with his innocence by arguing that his past friendship with several police officers, his psychological need to be "center stage," and his general mental imbalance contributed to the making of a fabricated statement intended to please his police friends.

11. Abstract of Record, at p. 31.

12. The prosecutor recognized, during his summation, that defense counsel had argued both theories on closing:

"[Defense counsel] at the end of the case talks in a debating manner out of both sides of his mouth. At one point in the very begin-

ning, he said the defendant did it but he was insane. When he argued to you before lunch, he did something different. He said the defendant didn't even do it."
Abstract of Record, p. 249.

13. In *Braley*, the defendant did not deny that he committed the homicide, but instead insisted that at the time he was highly intoxicated or, alternatively, that he was legally insane. The Ninth Circuit wrote:

"[T]he oversight in not furnishing the not guilty verdict form along with the opposite form constituted, in effect, a severely adverse comment by the trial judge, an impermissibly grave insinuation of judicial attitude toward the ultimate issue of guilt or innocence. Accordingly, we hold that the influence exerted by the trial judge, although unintended and probably resulting from a clerk's oversight, was so significantly irregular as to require a new trial."
403 F.2d at 860.

147 A.2d 313 (1959); [14] *but see Krzeminski v. Perini*, 614 F.2d 121 (6th Cir. 1980).[15]

 The facts show that there was no express stipulation, orally or in writing, by petitioner or his counsel, conceding the acts which constituted the crime. The only events at trial which might arguably constitute a waiver are the statements that were made in chambers during the verdict form conference. On that occasion, the sole relevant remark by petitioner's counsel was that he wanted the not guilty form submitted to the jury. Thereafter, the judge commented in pertinent part: "Three verdicts will be given. No objections." Whether the judge was stating "there will be no objections," or "there are no objections," or asking "are there no objections?" [16] simply cannot be ascertained from the cold record.[17] But regardless of what

**14.** In *Edwards*, notwithstanding that the defendant admitted a slaying, the Pennsylvania Supreme Court held that the trial court's failure to include a not guilty verdict form with the other five forms given to the jury deprived the accused of a fair trial. In rejecting the prosecution's argument that the defendant could not have been prejudiced by the judge's action due to the extreme unlikelihood of the jury acquitting an admitted slayer, the court wrote:

"[I]t still must be left to the jury to decide whether an admitted slayer had or did not have justification or excuse for what he did. . . . It is the trial and the trial alone which decides whether a defendant is assuredly guilty. . . . [N]o matter with what certainty the Judge views the culpability of the accused at the bar, the defendant is still entitled to all of the safeguards of a fair trial as announced in the Constitution, and the law of the land."

147 A.2d at 314–315.

**15.** In *Krzeminski*, the state trial judge instructed the jury:

"The defendant, having admitted in open court that he killed the deceased, a verdict of not guilty cannot be returned in this case, and it is your duty to determine whether the defendant is guilty of murder in the first degree, murder in the second degree, or manslaughter in that order, or whether the defendant is not guilty by reason of insanity."

614 F.2d at 124.

The Sixth Circuit found that this constituted a "patent constitutional violation." *Id.* It wrote:

"No matter how overwhelming the evidence, a judge cannot direct a verdict of guilty or instruct a jury that it must find the defendant guilty. *See e.g. Sparf v. United States*, 156 U.S. 51, 105 [15 S.Ct. 273, 294, 39 L.Ed. 343] (1895); *Schwachter v. United States*, 237 F.2d 640, 644 (6th Cir. 1956) and cases cited. Any doubt that this rule is constitutionally based was removed by *In re Winship, supra*, 397 U.S. at 364, [90 S.Ct. at 1072] which mandates that the prosecution prove every element of a crime beyond a reasonable doubt to the satisfaction of the finder of fact. In a case tried to a jury, that body must make the decision as to guilt or innocence. A judge cannot order a jury to find the defendant guilty of *something*. The trial judge's instruction in this case did precisely that." *Id.* (Emphasis in original.)

In finding the constitutional error harmless beyond a reasonable doubt, the court reasoned:

"The defense at trial never argued that the defendant should be found not guilty. It argued that the defendant should be found not guilty by reason of insanity, or alternatively, guilty of a *lesser included offense of first degree murder*. The defendant admitted the murder to numerous other people and recounted the details of the murder from the witness stand to the jury. Five people testified that the petitioner admitted the murder to them. A friend of the petitioner testified that on two different occasions, the petitioner stated that he was going to kill his wife. The only effect of the judge's instruction that the jury could not acquit the defendant was to minimize the possibility of jury nullification. Only an irrational jury could have acquitted the defendant outright."

*Id.* at 125.

Insofar as the harmless error doctrine is concerned, the present case is clearly distinguishable from *Krzeminski* since at trial Ross contested whether he committed the homicide, *see* notes 6–11 and accompanying text, *supra*, argued that his confession need not be believed, *see* note 10 and accompanying text, *supra*, and there was no evidence other than his confession directly linking him to the crime. We find the doctrine of harmless error inapplicable to this appeal.

**16.** There is no question mark following the words "no objections" in the transcript, but we would indeed be chary to place much weight on that fact where there is no other clue as to the trial court's meaning, since the omission may have been an inadvertent error by the stenographer.

**17.** The Illinois Appellate Court concluded that the judge's comment indicated that "defense counsel was not objecting to the exclusion of the simple 'not guilty' verdict for the record." 28 Ill.Dec. 690, 380 N.E.2d at 900. We are at a loss to see how this conclusion could have been reached from the silent transcript other than on the basis of speculation.

meaning is attributed to the judge's statement, we think it clear that the colloquy as a whole did not constitute a waiver of Ross' right to have the jury decide whether he committed the criminal acts with the requisite intent.

The waiver of a constitutional right must be "an intentional relinquishment or abandonment of a known right." *Johnson v. Zerbst, supra,* 304 U.S. at 464, 58 S.Ct. at 1023; *see also Brookhart, supra,* 384 U.S. at 4, 86 S.Ct. at 1247. The mere failure of counsel to object to a court ruling, which follows on the heels of counsel's express indication of an intent not to surrender the right in question, clearly does not rise to this high standard, particularly since " 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights." *Johnson, supra,* 304 U.S. at 464, 58 S.Ct. 1023 (citation omitted). Moreover, it has long been the law of this circuit that counsel may not stipulate to facts establishing the guilt of the accused without the defendant's consent. *See Achtien v. Dowd,* 117 F.2d 989, 993–994 (7th Cir. 1941). Here, there is nothing in the record from which it could reasonably be inferred that Ross knew of and consented to the supposed stipulation: no written or oral statement by the accused, *compare e.g., United States v. Strother,* 578 F.2d 397, 403 (D.C. Cir. 1978) (oral statement); *United States v. Terrack,* 515 F.2d 558, 560 (9th Cir. 1975) (signed stipulation); no representation by counsel that he had consulted petitioner, *compare, e.g., Strother, supra,* 578 F.2d at 402 ("counsel reported to the court that he had discussed the matter with appellant"); *Palfy v. Cardwell,* 448 F.2d 328, 330 (6th Cir. 1971) ("counsel testified that prior to trial they had approximately twelve discussions concerning . . . stipulations");

no inquiry of the defendant by the trial judge; *compare, e.g., Palfy, supra,* 448 F.2d at 330; *Strother, supra,* 578 F.2d at 402–403; nor did the relevant events, which took place in chambers, occur in the presence of petitioner, *compare, e.g., Corley v. Cardwell,* 544 F.2d 349, 351 (9th Cir. 1976) (admission made during opening argument); *United States v. Harper,* 460 F.2d 705, 707 (5th Cir. 1972) (stipulation made "in open court").[18] *See also Wiley v. Sowders,* 647 F.2d 642, 650 n.8 (6th Cir. 1981) (defendant's consent to attorneys' concession of guilt "cannot be presumed from a silent trial record"). In addition, it is important to note an unusually sensitive situation would be presented where defense counsel on behalf of a defendant who has pleaded not guilty, stipulates to the defendant's commission of the acts while at the same time contending that the defendant acted while suffering from a mental disease. The scenario raises not only the standard question of the defendant's consent to the waiver, but also the further question of his capacity to consent. Thus, courts have held that "where a defendant in a criminal case seeks to waive trial on all issues except insanity the trial judge should address the defendant personally in determining whether the waiver is made voluntarily with understanding of the consequences of his act." *United States v. Brown,* 428 F.2d 1100, 1103–1104 (D.C. Cir. 1970).[19] No such inquiry was ever attempted in the present case.

We conclude that the facts of the instant appeal do not establish a waiver of petitioner's right to a jury decision as to whether he committed the crime. Consequently, it was error for the trial court to submit only the three verdict forms to the jury, since

18. In the present case, the district court relied upon *Harper* as precedent that in similar circumstances courts have properly limited the jury's deliberations to whether the defendant was simply guilty or not guilty by reason of insanity. That reliance was clearly misplaced since in *Harper,* unlike the present case, there was an express and unequivocal stipulation "in open court that the allegations contained in the indictment were true." 460 F.2d at 707.

19. The reasoning of the *Brown* court, (with which we agree), was that "[b]ut for the reservation of the mental issue [the stipulation] was a plea of guilty." That fact, coupled with the disputed mental condition of the defendant, was sufficient to warrant the type of personal inquiry by the judge that Rule 11, Fed.R. Crim.P., requires when a defendant pleads guilty.

that action, together with its instruction to choose among the three forms, effectively foreclosed any realistic possibility of a not guilty verdict.

We note that respondent has not been served, but has participated on appeal as amicus, and thus we assume that formal service may be accomplished within 10 days of receipt of our mandate in the district court. Petitioner will be entitled to release from custody unless he is again brought to trial within ninety days after such service is made.

Reversed and Remanded.

PELL, Circuit Judge, dissenting.

The majority opinion after a careful step-by-step analysis of the record in this case concludes that a state trial court judgment should be vacated in the exercise of the habeas power of the federal courts. What the majority opinion in essence is saying is that Theodore Ross did not have a constitutionally fair trial in the state court. I cannot agree and respectfully dissent.

Ross after meeting privately, but separately, with his girlfriend and his pastor confessed to stabbing Mrs. Abrams with a kitchen knife, trying to choke her, beating her with a two-by-four, and then stabbing her again, twenty-six times altogether. He then placed her face down in a bathtub full of water.[1] No place in the record do I find any indication that this confession was not voluntarily and freely given nor is there any real contention that Ross did not commit the acts which he described in his confession.

At the state court trial Ross introduced the following testimony: the testimony of his girlfriend who described various instances of strange conduct on his part; the testimony of his mother who told of strange accidents and behaviors on his part; the testimony of a psychologist who had examined Ross and found that he had overall good contact with reality but had signs of latent schizophrenia; the testimony of a professor of psychology who had examined Ross and found signs of latent schizophrenia although doubting that this would hinder him from contact with reality; the testimony of a psychologist who diagnosed Ross as having a schizophrenic disorder; the testimony of a psychiatrist who had examined Ross and found a latent schizophrenia.

The majority opinion finds particularly significant the closing argument of defense counsel and states that it plainly shows that Ross did not concede commission of the offense but in fact challenged the state's evidence. I am unable to read the closing argument as does the majority. Defense counsel was well aware at the time he made the argument that there was no straight or simple not guilty verdict form to be submitted to the jury. It is true that during the course of a wide-ranging argument he did discuss some deficiencies in the state's evidence which other than the confession was of a circumstantial nature as the only two eyewitnesses were the decedent and Ross. The main thrust, however, of the argument, which is contained in some thirty pages of transcript, was lack of mental capacity on the part of Ross. The argument concluded as follows:

I don't think you would have any trouble in considering that evidence that beyond any reasonable doubt Ted Ross is insane. But the judge will instruct you that it works another way, because the state has the burden—that is the way it should be, because the State has all the power; the State has the burden of proving to you beyond a reasonable doubt that Theodore Ross was sane. They have not done so.

I have faith that once you retire to the jury room, when you go over the evidence, as I said to you at the beginning, your verdict will have to be not guilty because Ted Ross was insane and he is still insane.

1. The viciousness of the crime is demonstrated by an extract from the confession attached hereto in an appendix.

It seems to me that in analyzing the significance of the closing argument we should, just as we do in the case of instructions, consider the totality of the argument and not take segments out of the overall context. From that point of view it appears quite plain to me that defense counsel did nothing more than engage in a carefully orchestrated artful ploy which, in view of the present majority opinion, has reaped a dividend which he was not seeking or perhaps did not even anticipate at the time of the argument. That ploy, putting it quite simply, was that the expert witnesses not having come down strongly supporting the insanity defense strength could be lent to it by the red herring of pointing out the deficiencies in the direct evidence such as there having been insufficient time for Ross to have laundered his clothing after the crime with the ultimate hope that the jurors by way of compromise could bring back the verdict which he asked them to bring, not guilty by reason of insanity.

Because I do think that the majority opinion has misread the final argument I turn to it in some detail. After opening by referring to his opening statement that the pieces of the puzzle would come together he said that they had now come together and then he said

> I told you that when this case stops at this point, that you will see a picture of a very sick, very disturbed, a very twisted mind of a young man, Theodore Ross.

He then pursued further support for his thesis in the evidence of the difficulties that had beset Ross as a child:

> As we went over the evidence, those pieces that came from the stand, I think the evidence shows that while growing up, Ted received a lot of injuries to his head. When he was a little boy, when he was about four, he got a deep cut on the top of his head. It was so deep his mother said she could see his skull. But there were several other very bad gashes on his head.
>
> Later in life, he was in an automobile accident where he hurt his head again. You heard that they had to dig glass out of his head.

> I think we also heard testimony that there was a scar on his chin. That is only part of it. There are a lot of strange and unusual things that happened to Ted while he was growing up.
>
> Probable the strangest thing that I think we can consider was Ted's relationship with his mother. It doesn't seem Ted and his mother got along very well. It appears that Ted was very bitter and very resentful toward his mother.
>
> She testified that Ted, at about the time he was eight years old, sort of blamed her for his diabetic condition.

Counsel then pursued at some length the relationship that Ross had had with his own mother, mentioning various specific incidents. While a young boy he had been hunting one day with a shotgun. His mother told him to clean the gun. He refused and pointed the gun at her and started to pull the trigger. At another time for no apparent reason and out of nowhere Ross had picked up a pot of hot coffee and thrown it at his mother. At another time when he was a teenager he had picked up a baby's chair, held it over his head and tried to kill his mother.

Counsel pointed out that any child could build up a certain amount of resentment toward a disciplinary parent "but for Ted, it seems that his resentment, his bitterness, was a lot more intense, a lot more unusual and very strange." Counsel also mentioned the incident when Ross was 16 years old he came home and told his mother he wanted to marry his girlfriend and upon her refusal to give consent he stated he was going to kill himself. The mother later went to the medicine chest and found six empty bottles and Ross spent the next three days in the hospital. It appears to me that the development of this mother-hate relationship while showing a bizarre behavior pattern further was a lead-in to his relationship with the decedent which counsel characterized in final argument as a "mother-son relationship." Implicit is the thought that, as counsel said, Ross "probably did look upon Mrs. Abrams as a mother figure," and

his insane dislike of his mother could suddenly be transferred to the substitute mother figure.

Counsel continued dwelling upon other evidence of mental instability. The chief of police characterized Ross as a strange kid, "he was a loner. He was, quote, 'removed from reality,' that he fantacized a lot."

Counsel then referred to the testimony of Ross's girlfriend who was pregnant by him at the time of the homicide. Counsel referred to the fact that she was now in college and had come back to testify although she was upset:

> But nevertheless, she came back and testified to what I think was very important in this case. This is the only thing that is really important to the issues in this case.

> She said that on at least one occasion she watched Ted and his sister Lynn and brother-in-law Ron, watched, picked a little kitten they had, for no reason like Dr. Jekyl and Mr. Hyde, picked the kitten up and slammed it up against the wall several times for no reason.

> She said that they went out on dates. They usually went to movies. The only kind of movies that Ted liked to go and see were disaster movies where people were dying, people were being hurt. They might see a lot of pictures like that, scenes of disaster were of interest to Ted Ross.

Counsel continued by referring to her testimony that she did not think that Ross had the capacity to conform his behavior to what is required by law, "because it was after the time he was arrested for burglary, she said, 'Why did you do it?' He said, 'I don't know.' I think that was part of the reason. He felt that way about death, thought of death that way."

Counsel then took up the expert testimony:

> You heard the doctors testify that Ted Ross was and still is a very sick young man. Each and every one of those doctors classified Ted as a schizophrenic.

Two of them said latent type of schizophrenia. Two said paranoid schizophrenia. But all four of them told you that schizophrenia is a very serious mental disease, that it is very severe, that it affects the perception of the world, and that it affects the way one acts and the control one has to one's behaviour.

By this time, having finished approximately one-fourth of his argument, counsel summarized what I regard as the principal thrust of the argument:

> So at this time I am merely reciting this to say that I am confident by those pieces of evidence that we have presented that we have kept our promise to you. I think that we demonstrated very effectively by the best evidence that we could provide that Ted Ross was and still is legally insane. I promised from this evidence that you would have a reasonable doubt as to the sanity of Ted Ross on March 10th, 1975, to be present in your minds at this time.

The counsel then took up the state's evidence, pointing out, as has already been indicated, minor deficiencies, such as that there had been no technicians from the crime laboratory to testify that there were no blood stains on the two-by-four with which, according to Ross' confession, he had struck the decedent. Throughout the remainder of the argument there is an undercurrent of emphasis on the mental instability of Ross. At one point counsel spent some time reminiscing about his own army experience (more than three pages of the record) in which it had developed he had pneumonia although the army doctors had told him he was not sick:

> But I only repeat this story to tell you and help underline what I think, that we don't need anybody to tell us that Ted Ross is sick, that something is wrong with his mind; that if you believe this evidence which is really just a confession, if you believe this, that he stabbed a lady that was like a mother to him for no reason under the sun,[2] and he stabbed her

---

2. Just as Ross had "for no apparent reason, out of no where," picked up a pot of hot coffee and thrown it at his mother.

twenty-seven times; that if you believe he beat her with a two-by-four or anything else, I think you have to also believe that Ted Ross was insane.

Among other deficiencies in the state's case counsel argued, was the matter of some apparently missing jewelry and he emphasized Ross had not been charged with theft or stealing or burglary and that there was not any evidence of it. This ambivalent remark then followed, "I think it is a little bit unfair, but nevertheless you have to consider it." Also of possible significance although, in fairness, the counsel may not have been correctly reported, the transcript shows:

We know he stabbed somebody twenty-six times. For money? Or jewelry?

In other aspects of the majority opinion, I have difficulty in accepting that the elimination of a form of not guilty verdict "unconstitutionally directed a verdict against the petitioner." If there was any possibility whatsoever that this jury would have found on the record in this case the defendant not guilty, and there was not any form so to indicate, all the jury needed to say was that it was unable to agree upon any of the verdict forms and present the court with a hung jury. Juries that are not able to agree are not unknown in the law. Indeed instances are known of juries writing other matters on verdict forms. Here all that needed to be done was to cross out the reference to mental condition on one of the not guilty forms including such a reference.

The majority opinion attaches significance to the fact that the defense moved for a directed verdict at the end of the state's evidence. I find little basis for significance in this. The fact that there is no ghost of a chance for a directed verdict being granted does not customarily seem to discourage the filing of such a motion. In any event, in this particular case, as is indicated by the final argument of counsel, the jury already having been advised on opening statement that unsoundness of mind was to be the defense, a motion of directed verdict was appropriate in support of the contention that the state had not proved that Ross was of sound mind at the time the offense was committed.

There are very few attorneys who cannot relate some instance of a jury behaving in an aberrant manner and bringing in a verdict which was without any justification whatsoever or at least the attorneys, for one reason or another so regard it. If it were not so no judgment n. o. v. would ever be upheld. I question, however, whether the constitutional protection of a fair trial should be extended to protect the right to have an aberrative jury verdict. That is what would have resulted here if there had been a straight not guilty verdict. Therefore, in any event, unless we say harmless error can never exist, it appears to me that the writ of habeas should not be granted in the present case. I would therefore for any of the foregoing reasons affirm the judgment of the district court.

In any event, noting that the majority opinion finds that the colloquy between the judge and counsel on the refusal to give a straight not-guilty verdict form did not constitute a waiver of Ross' right to have the jury pass on this issue, it appears to me that it would have been more appropriate, rather than to set aside the state trial court conviction to have remanded the case to the district court for an evidentiary hearing to determine what did happen at the time of the colloquy and whether it could have been properly considered to have been a binding waiver on the part of Ross.

APPENDIX TO DISSENT

Q. How long in space of time did you stab her?

A. One right after the other.

Q. Okay. How long did that go on?

A. Fifteen or twenty seconds.

Q. Then what happened?

A. Then she stopped struggling and she crawled over by the entrance of her bedroom next to the wall.

Q. Okay.

A. And I went over and got the two by four that I had placed earlier in the window when I opened it in the afternoon.

Q. Was that just to let the air come in the house?

A. Yes.

Q. What did you do with that two by four? By the way, could you describe it for us?

A. I believe it was a two by four. It could have been a two by five or two by six. It was about four feet long.

Q. About four feet long?

A. Three and a half to four feet long.

Q. What did you do with that?

A. I then hit her. She was covering her head with her elbow and I hit that.

Q. Was she covering her head with both elbows?

A. No. Just one.

Q. One hand like that?

A. Yes.

Q. Was she saying anything to you as this time?

A. No.

Q. Okay. What did you do?

A. I hit her in the head a couple of times.

Q. How many times?

A. I don't remember.

Q. Did you see any bones smash or anything like that?

A. I believe when I hit her in the elbow I broke her arm. I don't know. Then I hit her three or four times in the head.

Q. Did you hear anything crack in her head or anything when you were doing it?

A. All I heard was the noise from the board hitting her head.

Q. Can you tell us what the noise sounded like?

A. Like a twenty-two.

Q. A sharp noise?

A. A twenty-two pistol.

Q. It was a sharp cracking sound?

A. Yes.

Q. And after you hit her over the head a couple of times, then what did you do?

A. Then I hit her in the head a couple of times and then she rolled over and knocked the mirror down and broke it and I hit her one more time.

Q. Where did you hit her that time?

A. In the head. I believe that's what killed her, the last one.

Q. Did she say anything during this period of time while you were hitting her over the head?

A. I don't believe she could speak.

Q. Why do you say that?

A. Because I had jammed the knife into her throat.